In the Interest of C.M.M.,
C.E.E., and D.T.E.

Nos. 53704—53708.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 14, 1988.

Laura Barrientez Bauer, James Michael Hardcastle, St. Louis, for appellant.

Donna Lyn Head, Government Counsel, Joan J. Corderman, Appointed Counsel, St. Louis, for appellee.

DOWD, Judge.

Mother and father appeal from the judgments of the trial court terminating their parental rights. We affirm.

Mother is the natural mother of C.M.M. born on January 8, 1975, C.E.E. born on July 21, 1981, and D.T.E. born on July 25, 1983. Father is the natural father of C.E.E. and D.T.E. and the stepfather of C.M.M. The natural father of C.M.M. voluntarily consented to the termination of his parental rights to the child.

The three children have been in foster care since August 1984 following a hot line call by mother reporting that father had sexually abused his stepdaughter C.M.M. On November 5, 1984, the children were found by the juvenile court to come within § 211.031, RSMo and legal custody of the children was transferred to the Missouri Division of Family Services. [hereinafter DFS]. In the court's order it was determined that father sexually molested C.M.M. over a period of one year and that mother and father engaged in sexual intercourse in the presence of C.M.M. In addition, the court in its order concluded that father physically abused C.E.E. The court determined that mother and father were not fit parents or suitable custodians for the children.

DFS assigned a social worker to mother and father to work with them in developing a plan to facilitate the return of the children to the home. Visitation was arranged and mother and father maintained regular contact with the children.

In May 1985, DFS presented a social service plan to mother and father detailing what they needed to accomplish prior to the return of the children to the home. In 1965 father had been found to be a criminal sexual psychopath and was committed to the State Hospital in Fulton, Missouri where he remained until 1978. Under the terms of the social service plan father and mother were to obtain evaluations from the Masters & Johnson Institute incest family treatment program and follow any recommended treatment. Father and mother were also to attend parenting skills classes and attend counseling sessions at Malcolm Bliss Mental Health Center. Further, mother and father were directed to enroll in vocational rehabilitation programs and to make monthly visits with the children.

At the time the social service plan was presented in May 1985, mother and father refused to sign the plan. Father was antagonistic and uncooperative with the social workers. Mother was cooperative but was so dependent on father and so willing to support father that she contributed to the delay in satisfying the terms of the plan.

Mother entered a vocational rehabilitation program in July 1985 as required by the social service plan. Father did not satisfy the requirement. At the time, father derived his income from collecting and reselling scrap metal.

In July 1985, mother and father finally gave DFS their authorization for psychological evaluations with the juvenile court. Mother and father still refused, however, to sign authorizations for psychological evaluations by the Masters and Johnson Institute. Father failed to complete his tests with the juvenile court as he did not

show up for two appointments. During one appointment, father indicated he was a victim of sexual abuse as a child and believed himself to be bisexual.

As a result of mother's examination, the juvenile court psychologist concluded mother was a depressed, impulsive, and sexually preoccupied woman with a dependent lifestyle. Mother was determined to be at risk for physically abusing the children herself due to her inability to control her temper. The psychological evaluation revealed that mother tended to direct her efforts towards preventing father from getting angry to the detriment of the best interests of the children. Mother was unable to protect the children from father and according to the juvenile court psychologist, mother exhibited poor motivation to change.

In August 1985, upon referral by DFS, a family counselor from the Magdala Foundation began visiting mother and father weekly at their home to work on parenting skills. Father was aggressive and belligerent during the visits and a majority of each session was spent calming father down.

Mother and father's parenting skills were described as poor. C.M.M. was approximately ten years old at the time and father was still bathing her. Mother and father also performed sexual intercourse in the presence of C.M.M.

Father admitted to the counselor that he physically abused mother and the children but never admitted the sexual abuse of C.M.M. Mother expressed anger towards C.M.M. for making the allegation of sexual abuse. At the time this counselor stopped working with mother and father in August 1986, he felt they needed additional treatment, ideally in the form of the Masters & Johnson program.

In November 1985 mother finally gave her authorization for psychological evaluations by the Masters & Johnson Institute. Father finally consented to the evaluations in December 1985. Based on their evaluations, mother and father were refused acceptance into the program. It was determined that mother and father needed more intensive treatment than the Masters & Johnson program could offer. The Mas-

ters & Johnson program is designed for situations where the perpetrator admits the offense and where the spouse admits the offense and does not support the offender. The program is not designed for cases where major psychopathology is involved.

As a result of the evaluations it was determined that father would not be amenable for an out-patient treatment program such as that provided by Masters & Johnson. Father was described as having a wide variety of sexual interests including children and possessed a high level of anxiety with poor impulse control. The evaluating psychologist considered father to have a very high probability of engaging in deviant sexual behavior with children and was of the opinion that father presented a sexual danger to his children. It was recommended that father receive in-patient treatment or long term in-depth psychological treatment where he would be very closely supervised.

As to mother, a more intensive out-patient treatment was recommended focusing on parenting skills and the need to support the children. There was no known treatment program in the St. Louis area that could provide mother and father with the intensive treatment needed. The Masters & Johnson psychologist predicted that there was little likelihood that mother and father could achieve adequate parenting skills in the near future.

Following the results of the Masters & Johnson evaluations, DFS referred the case for termination of parental rights. At the termination of parental rights hearing, it was the collective testimony of the DFS social workers and juvenile court officer that it was in the best interests of the children to terminate parental rights and free the children for adoption. At the time the children had been in foster care for three years. Both the foster families of C.M.M. and C.E.E. wished to adopt the children and an adoptive home for D.T.E. is available.

These witnesses testified that mother and father lacked the willingness to deal with the sexual abuse of C.M.M. Father denied the sexual abuse of C.M.M. and

mother never fully admitted that the abuse occurred. Mother stated she believed father's brother had sexually abused C.M.M. but tended to blame C.M.M. for the incident. Instead of expressing any protectiveness over C.M.M. or any sympathy for what she experienced, mother wondered how C.M.M. could go for a guy like father's brother. Mother also questioned why C.M.M. was causing mother problems and stated it was not her job to take care of C.M.M. as mother had two other children to be concerned with. In addition, mother believed her first husband, C.M.M.'s natural father, had sexually abused C.M.M. but mother did not protect C.M.M. from that abuse.

According to the DFS social workers, treatment from the Masters & Johnson program was an integral part of the social services plan developed by DFS. Masters & Johnson's finding that mother and father were not amenable to the Institute's treatment program coupled with the fact that there is no appropriate program within the St. Louis area of the intensity needed by mother and father led these witnesses to conclude mother and father could not provide the children with a safe home environment.

Father testified at the termination of parental rights hearing and admitted that during the summer of 1986 he called a St. Louis television station and made a statement threatening to kill four women. Mother also testified and revealed she is afraid of father and that he physically abused her just two weeks prior to the hearing but that she continues to live with father.

On August 3, 1987, the juvenile division of the circuit court entered its orders terminating the parental rights of mother and father under § 211.447.2(3), RSMo 1986, which provides for termination where a child has been under the jurisdiction of the juvenile court for a period of one year and conditions of a potentially harmful nature continue to exist with little likelihood that those conditions will be remedied at an early date.

Mother appeals from the judgments terminating her parental rights to C.M.M., C.E.E., and D.T.E. Father appeals from the judgments terminating his parental rights to C.E.E. and D.T.E. By this court's own motion the five appeals before us have been consolidated.

The primary concern of a termination of parental rights hearing is the best interests of the children. *In Interest of M.E.W.*, 729 S.W.2d 194, 195 (Mo. banc 1987). It must be shown by clear, cogent and convincing evidence that one of the statutory grounds for termination exist. § 211.447.2, RSMo 1986. An appellate court should affirm the judgment of the trial court in a termination of parental rights action unless there is no substantial evidence to support it, it is contrary to the evidence or it erroneously declares or applies the law. *In Interest of M.E.W., supra,* at 195–96. Where the trial court has received conflicting evidence, due regard should be extended to the trial court's opportunity to judge the credibility of witnesses and appellate courts should review the facts in the light most favorable to the trial court's order. *Id.*

In her first point mother contends the trial court erred in terminating her parental rights on grounds that conditions of a potentially harmful nature continue to exist in that the state failed to prove its case by clear, cogent and convincing evidence. Mother contends there was no substantial evidence that she lacked the ability to parent and the fact that she continued to reside with father was not substantial evidence that potentially harmful conditions exist. In a related point, father contends the trial court erred in finding that conditions of a potentially harmful nature continue to exist in that it would be potentially harmful to place the children in the custody of father.

A review of the record demonstrates there was clear and convincing evidence that conditions of a potentially harmful nature continue to exist. "The clear, cogent and convincing standard of proof is met when the evidence 'instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the

fact finder's mind is left with an abiding conviction that the evidence is true.'" *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984). This standard of proof may still be met even though the court has contrary evidence before it. *Id.*

The evidence supported that father posed a risk to his children. Father physically abused C.E.E. and sexually molested C.M.M. In 1965 father was found to be a criminal sexual psychopath and was committed to a state hospital. The juvenile court psychologist found father to have tenuous control over his impulses and to have confusion concerning his sexual preferences and appropriate sexual behavior. The psychologist from the Masters & Johnson Institute concluded that father had a very high probability of engaging in deviant sexual behavior with children and that father posed a sexual danger to his own children. There was clear, cogent and convincing evidence that it would be potentially harmful to place the children in the custody of father.

The state likewise met its burden of proof that mother lacked the ability to parent. The counselor from the Magdala Foundation testified that mother and father's parenting skills were poor and improved only minimally during the period of one year in which the counselor worked with the family. Further, the psychologist from the Masters & Johnson Institute testified that mother's parenting ability was inadequate in that mother's dependence on father and her willingness to support him took priority over the best interests of her children. The juvenile court psychologist concluded mother was unable to protect her children from father and found mother possessed poor motivation for change.

Mother was unwilling to fully recognize and address the sexual abuse by father of C.M.M. Mother admitted she believed C.M. M.'s natural father had sexually abused C.M.M. and that father's brother had sexually abused C.M.M. but failed to protect C.M.M. from this abuse. Mother was diagnosed as being sexually preoccupied and stated she had likewise been sexually molested as a child. The fact that mother needs a more intensive treatment program than is available in the St. Louis area, together with mother's inability to fully recognize the sexual abuse of C.M.M., supports the conclusion that mother is unlikely to improve her parenting skills within an ascertainable period of time.

As to mother continuing to reside with father, the danger father poses to the children has been discussed. It is true that the DFS social service plan focused on joint treatment for mother and father due to their expressed desire to remain together. Father, however, was extremely uncooperative in delaying his psychological examinations and then refusing to complete the tests. Mother contributed to the delay by not separating herself from father's antics. Mother was given the option to seek treatment on her own but refused. Thus mother added to the delay in obtaining the Masters & Johnson results which were very unfavorable. Moreover, mother continues to reside with father and admitted father physically abused her just two weeks prior to the termination of parental rights hearing. In summary, there was clear and convincing evidence that conditions of a potentially harmful nature continue to exist. Both mother's first point and father's first point are denied.

Mother contends in her second point that the trial court erred in failing to review the terms of the social service agreement and the level of compliance with the agreement. Further, mother contends there was not substantial evidence that the efforts of the agencies were unsuccessful and that the court failed to consider whether mother contributed to the failure by the agencies. In a related point father contends there was not substantial evidence that additional services would not be likely to bring about lasting parental adjustment enabling return of the children to father.

Section 211.447.2(3), RSMo 1986, requires the court to consider and make findings on certain factors in determining whether to terminate parental rights for failure to rectify conditions which led to removal of the children from the home. Mother contends the court did not consider

the terms of the social service plan or her compliance with the terms as required by § 211.447.2(3)(a). The record shows otherwise.

The social service plans for both mother and father were read into the record and thus the terms of the plans were considered by the trial court. In its decree terminating parental rights the court found that mother refused to sign a written service agreement with DFS but that after some reluctance she complied with all of the terms set forth in the written service agreement.

The fact that a parent complies with all of the terms of the written service agreement, however, does not necessarily preclude termination of parental rights. Section 211.447.2(3)(a) does not compel the court to consider only a complete refusal to comply with the plan as evidence supporting termination. *In Interest of R.H.S.*, 737 S.W.2d 227, 235 (Mo.App.1987). In this instance it was unforeseen that mother and father would not be amenable to treatment at Masters & Johnson and treatment by Masters & Johnson was integral to the service plan. Section 211.447 does not require any particular standard of treatment or services. *In re Interest of A.L.B. and S.W.B.*, 743 S.W.2d 875 (Mo.App.1987). The evidence was that the Masters & Johnson program was the only suitable program in the area to deal with the special problems of mother and father. The determination that not even the Masters & Johnson program was intensive enough to address their needs left little hope that mother and father could improve their parenting skills in the near future.

Moreover, full compliance with the terms of a plan may be insufficient where the parents make no commitment to change the course of their conduct which prevents the return of their children. *In Interest of R.H.S., supra*, at 235–36. The collective testimony of the psychologists was that mother exhibited poor motivation to change. Mother's lack of motivation was reflected in her failure to sign the social service plan, her refusal to seek treatment on her own, and her failure to timely consent to the Masters & Johnson evaluations.

Mother further alleges certain procedural deficiencies as to prior approval, formal notice, and the opportunity for a hearing regarding the service agreement. Inasmuch as mother's contention is a constitutional argument, the issue was raised for the first time on appeal and is not preserved for review. *In Interest of R.H.S., supra*, at 233.

As to whether the statutory requirements of § 211.447, RSMo 1986, were met, there is no requirement within the current version of the statute that mandates prior court approval, formal notice, or an opportunity for a hearing concerning a service agreement where termination is based on failure to rectify conditions of a potentially harmful nature. The procedural requirements referred to by mother were requirements under the 1982 version of § 211.447 for termination on grounds of neglect. This version of the statute was repealed in 1985 and the 1985 amendments to § 211.447 do not include any such requirements. Likewise, the cases cited by mother involve the prior version of the statute and are inapplicable.

Finally, as to mother and father's contention that there was not substantial evidence that the efforts of the agencies were unsuccessful and that additional services would not be likely to bring about lasting parental adjustment, we disagree. There was clear, cogent and convincing evidence that mother and father's parenting skills improved only minimally and were still inadequate after a year of counseling through the Magdala Foundation. Further, the evidence showed there is no treatment program in the St. Louis area able to address the needs of mother and father. Mother's second point and father's second point are denied.

In her final point mother contends the trial court erred in terminating her parental rights because termination is not in the best interests of the children. "The best interests of a child 'is at best a conclusion drawn from the facts and evidence presented.'" *In Interest of R.H.S., supra*,

at 236. The record is replete with evidence of mother's inadequate parenting skills. Further, the children had been in foster care for three years at the time of the termination hearing. Both C.M.M. and C.E.E. are in adoptive homes and an adoptive home is available for D.T.E. It is clear from the evidence that the children could not be returned to the home within any ascertainable time in the near future and the only viable option that will provide the children with permanent, stable homes is to terminate parental rights and free them for adoption. The trial court's determination that termination is in the best interests of the children is supported by the evidence.

The judgments of the trial court terminating mother's parental rights to C.M.M., C.E.E., and D.T.E. and terminating father's parental rights to C.E.E. and D.T.E. are affirmed.

STEPHAN, P.J., and PUDLOWSKI, J., concur.