In the Interest of F.C., M.C., and D.C.

P.C.(S)., Appellant,

v.

Missouri Department Of Social Services, Children's Division, Respondent.

No. 27487.

Missouri Court of Appeals, Southern District, Division One.

Jan. 25, 2007.

Shannon McKinney, Joplin, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Kathleen R. Robertson, Office Of The Attorney General, Jefferson City, for Respondent.

DANIEL E. SCOTT, Judge.

Appellant ("Mother") appeals the termination of her parental rights [1] to her three minor children, who were removed from the family home in December 2002, primarily due to Father's bizarre discipline and Mother's acquiescence. Father duct-taped the children into their beds, fed them raw eggs, made them run in place, forced them to lie naked on the floor, and beat them with a dog leash.

After placing the children safely in foster care, the Children's Division sought to reunify the family, identifying the main problems as Father's inappropriate discipline and Mother's failure to protect the children therefrom. The Division's plan for Father included counseling, parenting classes, and anger management classes. Mother was to attend programs on domestic violence, safety for children, alternatives to violence, parenting techniques, and stress management. Both parents cooperated and complied generally with their plans.

Next, the Division assigned a parent aide to supervise visits, assess parenting skills, provide suggestions, etc.—a "hands-on teacher while the children are with the parents," as one witness put it. The aide noted Mother was strongly dependent on Father, and became very dependent on the aide too, frequently calling the aide about things not particularly difficult. Mother could not reach common sense answers to fairly basic questions.

Nonetheless, in December 2003 the Division started developing a visitation plan for the children. The plan was to place F__ on an extended visit with his parents; let D__ begin some unsupervised visits; and increase parent aide services to let M__ start participating in some family visits. M__'s slower return was on a therapist's advice, since he was the "targeted child" whom Father had referred to as "spawn of the Devil" and whose beating initially led to the children's removal. Given Father's history of bizarre punishment, Mother was to take the initiative, without Father's involvement, regarding any discipline during the children's visits.

Before any extended visits, the family started family counseling services with Ellen Pendley in January 2004. Pendley's initial assessment of Father's parenting skills indicated he "didn't really have a good understanding of what was appropriate and what was not," which made Mother the more appropriate parent for disci-

---

1. The parental rights of the children's father ("Father") were terminated in the same case, but Father is not a party to this appeal.

pline. But Pendley diagnosed the parents with a partner-relational problem about discipline, with Mother appearing very dependent on Father to take the lead. So prior to any extended visits, Pendley talked with both parents about Father's inappropriate discipline. Mother assured Pendley she would take the lead in disciplining the children, and Father knew Mother was to be the main disciplinarian.

The first time the Division let all three children stay overnight with their parents was during spring break in March 2004. F__ peed in M__'s mouth at bath time, and rather than addressing it herself, Mother sent F__ to Father to take care of it. Father had F__ drink water from the toilet, then Mother called the parent aide so F__ could tell her what happened. Mother seemed unconcerned about what Father did, and apparently did not consider it inappropriate. Mother only became upset when she learned the aide would report it. An investigator arrived and returned the children to foster care that night, partly because F__ privately told the investigator he was afraid.

At a team meeting[2] ten days later, Mother had no good explanation for breaking her promise to handle discipline herself, the first time the family was reunited without supervision. The team discussed the case history, that it was a fifteen-month-old case, and that the parents had completed almost every available service. The team concluded it had nothing more to offer the parents to change the situation; the consensus was to change the goal from reunification. Pendley concurred, stressing that this event should not be viewed alone, but as a culmination of four years of problems. The toilet water incident was the straw that broke the camel's back; it

convinced her Mother was unable to parent unless someone was there with her. Pendley kept working with the family, but soon recommended ending the therapeutic visits. They were no longer beneficial and had become hard on the children. The children also told Pendley they had been coached to say they wanted to live with their parents.

The Division changed its case goal to adoption based on Father's inappropriate discipline, Mother's lack of follow-through in her discipline role, and Mother's lack of self-esteem to step up as a parent to provide a safe environment for her children and to protect them from Father. In early 2005, the court terminated the parents' visitation; a petition to terminate parental rights was filed; and the foster parents filed a petition to adopt the children. At the December 2005 termination hearing, Mother testified she recently divorced Father and if she regained the children, Father would have little or no involvement in their lives. But Mother admitted on cross-examination that she was living with Father at the time of trial. The juvenile court terminated both parents' rights, finding statutory grounds for termination under Sections 211.447.4(2) (abuse/neglect) and 211.447.4(3) (failure-to-rectify), and that termination was in the children's best interests. Mother's appeal challenges all three findings as to her.

■■■ For a court to terminate parental rights, it must find (1) at least one statutory ground for termination by clear, cogent, and convincing evidence; and (2) that termination of parental rights is in the child's best interest. *In re R.J.B.*, 30 S.W.3d 868, 870 (Mo.App.2000). We will affirm such an order unless no substantial evidence

---

**2.** Reflecting the situation's gravity, there was a "room full" of people at this meeting, including Mother, Father, the caseworker, her supervisor, the guardian ad litem, and two other Division representatives.

supports it, or it is against the weight of the evidence, or it erroneously declares or applies the law. This standard of review is not inconsistent with the "clear, cogent and convincing" standard of proof. *Id.* Furthermore, the standard of proof may be satisfied even if the juvenile court had contrary evidence before it or the record might support another conclusion. The juvenile court was in a superior position to judge the witnesses' credibility and was free to believe all, part, or none of their testimony. We consider all facts and reasonable inferences in a light most favorable to the judgment below, and we will reverse only when we firmly believe the judgment is wrong. *In re A.K.F.*, 164 S.W.3d 149, 151–52 (Mo.App.2005) (citing cases).

Mother's Points I and II challenge the abuse/neglect and failure-to-rectify findings respectively. We need only find one such basis was proven to affirm, if termination was in the children's best interest. *R.J.B.*, 30 S.W.3d at 870–71.

 Mother claims the evidence was insufficient to support the failure-to-rectify finding. Her argument cites evidence favorable to her position, and at least in part, contends the juvenile court should have reached a different result based thereon. To this extent, Mother disregards our standard and principles of review noted above.

Mother's argument really boils down to her assertion that "[s]imply citing one incident ... to support termination is insufficient" to prove a failure-to-rectify. Caseworker Kim Hembree's testimony reflects the tenor of the Division's trial evidence. She testified Mother had completed everything she had been asked to do, except

being the disciplinarian. She ordinarily would not consider the toilet water incident, by itself, as grounds for removal, but there was a long prior history of bizarre and inhumane punishment of the children. This incident, after all the prior counseling and services, and happening on the first occasion when the children were alone again with the parents, persuaded Hembree of Mother's lack of follow-through regarding discipline, self-esteem problems, and over-reliance on Father. Counselor Pendley concurred. The toilet water incident was the straw that broke the camel's back, convincing her that Mother was incapable of independent parenting. In fact, the treatment team's "consensus" was that the incident precluded reunification.

The children came into juvenile care because Father abused them and Mother acquiesced. This is what endangered the children; this had to be rectified for the children to return. Contrary to Mother's assertion, one incident convinced the Division, and ultimately the juvenile court, that the underlying problem was never rectified. We can check the common sense of such thinking in other "one-incident" scenarios:

- A philandering husband promises to change, and gets months of counseling, doing everything the counselor asks. He cheats again. Was his problem rectified?
- A child molester "successfully" completes the State's sexual offender program. A counselor testifies there is little risk he will re-offend. Is this disproved by his first relapse, without waiting for a third victim? [3]
- A battered wife finally leaves. Her husband faithfully attends anger-management classes for two years, and

---

**3.** Unfortunately, these situations are not always hypothetical. *See Taylor v. State,* 751 S.W.2d 112 (Mo.App.1988); *State v. Taylor,* 735 S.W.2d 412 (Mo.App.1987); *State v. Taylor,* 724 S.W.2d 706 (Mo.App.1987).

they reconcile. He beats her again the first time they are under stress. Did the classes fail to rectify his problem?

*In re T.H.*, 980 S.W.2d 608 (Mo.App.1998) also involved a father who abused the children and a mother who acquiesced. Both parents attended numerous parenting classes and counseling sessions after the children were removed, but the caseworker and a therapist testified the mother still could not handle safety and parenting concerns alone, and she showed no inclination to separate from the father. *Id.* at 610. In terminating parental rights, the juvenile court found no evidence of parental mental conditions or chemical addictions; the parents substantially complied with treatment plans; agency efforts to aid the family had failed; and the mother remained unable to protect and care for her children alone. *Id.* at 611. The court of appeals rejected the mother's claim that her termination was unfair since the father was the abuser and she did everything DFS asked her to do. *Id.* at 612. Although the mother tried to rectify the conditions, evidence showed there were no further programs to aid her beyond her present level, and no witness would say she could handle her parenting obligations alone. *Id.* at 612–13.

■ Compliance with a treatment plan does not preclude termination of parental rights. *In re L.D.R.*, 169 S.W.3d 137, 142 (Mo.App.2005); *In re C.M.M.*, 757 S.W.2d 601, 606 (Mo.App.1988). The mother in *C.M.M.* cooperated with DFS, but she was dependent on the father, unable to protect her children from his abuse, and showed poor motivation to change. *Id.* at 602, 603. Mother's continued residence and relationship with the father posed a danger to the children, notwithstanding her compliance with the treatment plan. *Id.* at 605, 606. The *L.D.R.* court likewise noted that a parent's continued exposure of children to

someone who can hurt them can justify termination, if not rectified. 169 S.W.3d at 141. There was ample evidence that the father could not separate from the abusive mother, but would expose the children to her if he got custody of them. *Id.* at 141– 42. The harmful condition supporting termination-the father's willingness to keep exposing the children to their abusive mother—instantly tipped the scales in favor of termination and was not remedied or outweighed by his compliance with the treatment plan. *Id.* at 142–43.

Mother also criticizes the brevity of the juvenile court's failure-to-rectify findings, and claims they were insufficiently detailed. The court addressed each statutorily required issue; said all that was needed in this situation; and the record supports those findings. Point II is denied; accordingly, we need not address Point I regarding abuse/neglect. *R.J.B.*, 30 S.W.3d at 870–71.

■ Point III claims the evidence did not establish that terminating Mother's rights was in the children's best interest. We follow the same principles of review as before, but we review this finding for abuse of discretion, which means we will affirm unless it is so arbitrary, unreasonable, and against the logic of the circumstances that it shocks the sense of justice and indicates a lack of careful consideration. *In re D.L.W.*, 133 S.W.3d 582, 583 (Mo.App.2004). Once again, Mother cites evidence in her favor and calls for a different result; an argument ineffective since we view the record most favorably to the judgment, and bearing in mind that the children's best interest is based on the totality of the evidence, which the court below weighs and we do not reweigh. *Id.* at 585.

Viewed in this fashion, the evidence amply supports the judgment. For example, it was well known from therapy and other-

wise that the children feared Father. He disciplined the children with "techniques" from his overseas military experience, like making them lie naked on a cold floor and beating them with a leather belt.[4] Mother knew Father's extensive history of such discipline, which is precisely why she was to take the initiative on future discipline. Yet her first response, the first weekend the children were back in the home unsupervised, was to send F__ to Father for discipline.

Even before the toilet water incident, the evidence showed F__'s behavior declined after his parental visits. F__'s post-traumatic stress symptoms caused severe behavioral problems at school; D__ exhibited problems of her own. Safety was the pervasive theme of Pendley's sessions with M__, who had trouble sleeping; said he hated Father: and hid in the closet or under Pendley's desk for at least part of

each family counseling session. But after eleven months without contact with their parents, the children were doing well at the time of trial. Most of their problems and symptoms had remitted; they didn't need counseling as often; and none of them wanted to return to their parents.

The juvenile court did not abuse its discretion in determining that termination was in the children's best interest. Point III is denied. Judgment affirmed.

RAHMEYER, P.J. and PARRISH, J., concur.

---

**4.** One witness testified there were discussions at several team meetings about Father's military background and that he "would often implement some of the quote, unquote torture methods that he had learned as discipline for the children." Although the record is unclear who coined the term "torture," we assume that neither parent so described Father's techniques.