

# Missouri Court of Appeals

## Southern District

### Division One

IN THE INTEREST OF:　　　　　　　　　　)
G.C., F.C., M.C., and S.C., Minors,　　　　)
　　　　　　　　　　　　　　　　　　　)
A.C.,　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　Nos. SD33029, SD33030, SD33031,
　　　　　　　　　　Appellant,　　　　　)　　　　and SD33032 (Consolidated)
　　　　　　　　　　　　　　　　　　　)　　Filed:　October 7, 2014
　　　　　vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
GREENE COUNTY JUVENILE OFFICE,　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Respondent.　　　　　)

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable William R. Hass, Senior Judge

**AFFIRMED**

A.C. ("Mother")[1] appeals the respective judgments terminating her parental rights to

G.C., F.C., M.C., and S.C. (collectively the "Children").[2] Finding no merit in Mother's points on

appeal, we affirm the judgments of the Juvenile Division of the Circuit Court of Greene County

(the "trial court").

---

[1] C.S.C. ("Father") is the children's biological father. Father consented to the termination of his parental rights and adoption and his rights were terminated as a part of the proceedings described herein. Father is not a party to this appeal, and we refer to evidence about Father only as is necessary to address Mother's appeal.

[2] The individual cases for each child were consolidated for this appeal. A petition was filed on behalf of each child and a separate judgment was entered with respect to each child.

## Factual and Procedural Background

Our recitation of the relevant facts is in accord with the principle that we view the evidence in the light most favorable to the judgment. *See*, *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 626 (Mo. banc 2014). "Appellate courts will defer to the trial court's credibility assessments. When the evidence poses two reasonable but different inferences, this Court is obligated to defer to the trial court's assessment of the evidence." *Id.* (internal quotation and citation omitted).

"All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." *Id.* (quoting Rule 73.01(c)).[3] "[W]e are not free to credit evidence or inferences that favor the terminated parent. To the contrary, we must ignore these." *In re Adoption of C.M.*, 414 S.W.3d 622, 630 (Mo.App. S.D. 2013) (internal quotation and citation omitted). "In reviewing questions of fact, the reviewing court is to recognize that the circuit court is free to disbelieve any, all, or none of the evidence, and it is not the reviewing appellate court's role to re-evaluate the evidence through its own perspective." *J.A.R.*, 426 S.W.3d at 627. "The trial court receives deference on factual issues because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." *Id.* (internal quotation and citation omitted).

Viewed in this context, the following facts are pertinent to the current appeal.

The record reveals that in early March 2011, G.C., now 11 years old; F.C., now 8 years old; M.C., now seven years old; and S.C., now six years old came to the attention of the Children's Division of the Missouri Department of Social Services (the "Children's Division")

---

[3] All rule references are to Missouri Court Rules (2014).

when Mother made a call reporting that G.C. was exhibiting sexualized behaviors toward her sister, F.C. Mother also stated she did not feel she could take care of the Children at that time.

Kate Dickensheet ("Dickensheet"), an investigator with the Children's Division, went to Mother's residence on March 14, 2011, to speak with Mother about her call to the Children's Division. Mother told Dickensheet that G.C. had been in a "behavioral hospital" at least nine times, and had been diagnosed with "ADHD, ODD, explosive disorder, impulsive control disorder, PTSD and mood disorder cycling." G.C. admitted to Dickensheet the inappropriate behavior. Dickensheet put in a referral to the Greene County Juvenile Office Delinquency Unit and set up interviews with the Child Advocacy Center ("CAC") for both G.C. and F.C. Following the CAC interviews, Dickensheet referred the entire family for counseling.

On March 31, 2011, Mother again contacted Children's Division stating she was at her wit's end with G.C. and she wanted to place G.C. in a residential facility. The Greene County Juvenile Office ("Juvenile Office") set up a juvenile conference for April 1, 2011. F.C., M.C., and S.C. were temporarily moved to Isabel's House,[4] and G.C. was placed in temporary residential treatment at Heartland Behavioral Health Services ("Heartland").

At another juvenile conference on April 11, 2011, Mother indicated she was overwhelmed with caring for the Children. She admitted that G.C.'s behavior problems and PTSD were from witnessing domestic violence between Mother and Father. Mother stated that Father would hit and push her, as well as force her to have sexual relations with him.[5] Father would yell, throw things, and even locked Mother and the Children in a motel room to keep them from leaving. Mother admitted she could not take care of the Children and it was in the

---

[4] Isabel's House is a center designed to provide an immediate refuge for children less than 12 years of age whose families are in crisis.

[5] Mother claimed the Children did not witness this behavior.

Children's best interest to be taken into State custody. The Children were placed into protective custody following the conference.

On April 12, 2011, a Juvenile Officer filed petitions to take custody of the Children. The petitions alleged Mother was unable to control G.C.'s physically aggressive and sexualized behaviors; could not manage the behaviors of the other children; that Mother admitted it was in the Children's best interest for her parental rights to be terminated; and that Mother and Father had been involved in a long-term physically abusive relationship that the Children had witnessed.

On April 29, 2011, a treatment plan was implemented for Mother. Goals included: (1) maintaining a stable and healthy residence; (2) obeying all federal and state laws; (3) identifying, understanding, and addressing day-to-day stressors and any possible mental health issues; and (4) providing safe parenting through appropriate discipline and physical interaction including completing anger management and domestic violence classes, and visiting the Children on a regular basis.

On May 17, 2011, an adjudication hearing was held. The trial court found the allegations in the petitions to be true and the Children came under the trial court's jurisdiction.

On October 1, 2012, petitions to terminate parental rights were filed on behalf of the Children alleging that Mother: (1) failed to make substantial or meaningful progress on her treatment plan; (2) failed to consistently demonstrate her ability to provide the Children with a stable home or appropriate care, custody and control; (3) failed to demonstrate appropriate parenting for the Children despite the provision of intensive services; (4) failed to rectify the ongoing chaotic home environment; and (5) failed in her ability to meet the Children's needs.

A hearing on the termination of Mother's parental rights to the Children was held on September 18, 2013. Mother did not testify.

4

Children's Division representatives testified that substantial resources were invested in attempting to reunify Mother with the Children. The Children's Division attempted two separate rounds of supervised visitation, unsupervised visitation, and permissive placements.[6] The Children's Division provided individual counseling for Mother, marriage counseling, parenting classes, and parent aides in her home to supervise visits with the Children and to assist Mother with her parenting techniques. James Snare, a caseworker for the Children's Division, testified that he provided Mother "probably more services than I've ever put in a home before." During permissive placement, Mother had between two and three workers assisting her in two-hour sessions, five-to-seven days a week.

One of the reasons the Children were first taken into State custody was because the Children had witnessed domestic abuse between Father and Mother. Despite this fact, Mother reunited with Father during the first permissive placement and the domestic abuse resumed. The Children's Division removed the Children from Mother's custody when this was discovered.

Evidence was presented that Mother was hostile toward and untruthful with Children's Division workers, and also failed, or simply refused, to implement their parenting suggestions. When Mother did implement parenting suggestions, it was "only to a degree," and not integrated in the way that Children's Division workers discussed with Mother. Mother also failed to attend parenting classes for over a year after they were first ordered as part of her treatment plan.

Mother was also told not to bring a woman named "Leta" to supervised visits because Leta was dominating the visits, causing the visits to descend into chaos, and Leta was filming the Children. Mother openly disregarded this instruction and continued to bring Leta to the visits. During a permissive placement, Mother and Leta had a physical altercation and Mother was told

---

[6] Every permissive placement was terminated after Children's Division determined that Mother's home or parenting techniques were not safe or healthy for the Children.

5

the Children were to have no further contact with Leta. Mother was specifically prohibited from using Leta for babysitting. Nevertheless, Mother continued to let the Children see Leta, and was untruthful with Children's Division workers about this fact. On one occasion, a Children's Division worker found the Children alone with Leta in Leta's apartment.

Mother also had ongoing problems with withholding food and beverages from the Children. Sometimes she would withhold food and beverages arbitrarily, and other times under the guise of disciplining the Children. On one occasion, G.C. asked for cereal for breakfast and Mother told her "no, she wasn't getting any, to go to her room." On another occasion, the Children came in from playing outside and Mother denied their request for drinks for no apparent reason. At one point, Mother attempted to withhold food from the Children for seven-to-eight hours as a form of discipline. The Children discussed that at times they were not getting enough food when they were at home with Mother.

There was testimony that the food Mother did provide for the Children was often inappropriate. Mother would purposefully prepare food the Children did not like, and then force the Children to eat substantial portions of it. Children's Division workers expressed concern about Mother's failure to refrigerate food, or that she sometimes served food cold that should be hot. When eating food Mother prepared, the Children often became upset, cried, and gagged.

Mother also experienced difficulty in discerning proper discipline techniques, which caused concern for the Children's safety. On one occasion, Mother restrained S.C. by holding him in her lap and twisting his arm. When a Children's Division worker told her this was not appropriate discipline, Mother said "that's the way she did things, [and] she wouldn't take any direction . . . not [to] do it like that." Mother threatened to "get the vinegar" to put in S.C.'s mouth. When told this too could be considered abusive, Mother retorted that "she knew what

6

she was doing, that everybody knew she did it." Mother also failed to keep track of the two younger children who would sometimes wander off without Mother knowing. Children's Division workers saw this as a serious safety issue that Mother did not take seriously.

There was testimony that when Children's Division workers were not present in Mother's house, things would "go back to normal," which involved "yelling and fighting" and "throwing knives and pots and pans." G.C. expressed concern with her physical and emotional safety while living with Mother. When Mother was not around the Children, the Children's behavior would improve, the Children were less anxious, and felt safer in expressing themselves.

Several psychologists and counselors evaluated and treated Mother and each of the Children. The psychologists were in agreement that the Children suffered from severe mental and emotional problems requiring ongoing individualized therapy and attention. Isabella Beeson ("Beeson"), a licensed counselor, opined that Mother failed to see any value in therapy for the Children and likely would not continue it if left to her. Beeson stated Mother felt "minimal empathy" toward the Children, exhibited little willingness to understand the Children's problems, and felt no responsibility for creating those problems. Beeson indicated that Mother's attitude was that once the Children were home, everything would be fine and there would be no need for individualized treatment or attention.

Children's Division workers also expressed concern that Mother felt "that if the [C]hildren were returned to her, that all of their issues and all of their problems would magically go away." Mother saw very little value in therapy and services for the Children, and Children's Division workers were fearful that Mother would discontinue those services if the Children were returned to her.

Despite the extensive resources brought to bear by the Children's Division and the two separate rounds of permissive placement, Mother's parenting techniques showed little if any improvement. Children's Division workers testified they would not feel comfortable for the Children's safety if the Children were placed back with Mother due to Mother's inappropriate discipline (including withholding food), Mother's failure to implement any substantive changes to her parenting, the younger children wandering off under Mother's supervision, and because Mother would likely fail to make sure the Children received the therapy and services required to treat their serious psychological and emotional problems.

Teresa Housholder, guardian ad litem for the Children, recommended the trial court terminate Mother's parental rights testifying that: (1) the Children were special needs children who, as a direct result of their parents' actions, would require significant resources to help them grow into healthy, productive young men and women; (2) Mother refused to acknowledge the Children's needs and chose to believe the Children's problems would go away if they were returned to her; (3) Mother blamed the State for the Children's attachment disorders and other problems, and refused to take responsibility for the part her own actions played in her loss of custody; and (4) Mother repeatedly or continuously failed to provide the Children with adequate care, custody and control in that she failed to demonstrate appropriate parenting, and failed to rectify the conditions which brought the Children into State custody.

The trial court made the following findings[7] in compliance with section 211.447:[8]

- The evidence presented was that [Mother] has been referred for every service the Children's Division has at its disposal and that none of those services have resulted in any lasting change by [Mother]. There is little to no likelihood that repeating a service already provided would have any different result.

- [Mother] has demonstrated a disinterest in or lack of commitment to the [Children] by continuing to disregard the [Children]'s feelings and by not making the changes required so that she could safely provide for the [Children]'s needs.

- Due to the failure of [Mother] . . . to take advantage of the services offered to [her], the Missouri Children's Division could only fail to rectify the conditions that led to the removal of the [Children].

- The continuation of the parent-child relationship greatly diminishes the [Children]'s prospects for early integration into a stable and permanent home.

- The [Children]'s guardian ad litem recommended that it was in the best interests of the [Children] for the [c]ourt to terminate the parental rights of [Mother] . . . in, to, and over the [Children].

The trial court concluded:

- Based upon the clear, cogent and convincing evidence presented in this proceeding, this [c]ourt finds and concludes that the allegations contained in the First Amended Petition to Terminate Parental Rights are true and that statutory grounds for the termination of parental rights exist in that:

    a. The [Children were] neglected by [M]other;

    b. [M]other failed to rectify the conditions that led to the [Children] coming into care; and

---

[7] The trial court made nearly identical findings for G.C., F.C., M.C., and S.C.

[8] All references to statutes are to RSMo 2000, unless otherwise indicated.

9

c.     [M]other is unfit to be a party to the parent and child relationship because of specific conditions directly relating to the parent and child relationship which are of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the [Children].

●     The [c]ourt concludes and finds that it would be in the best interests of the [Children] to terminate the parental rights of [M]other . . . in, to, and over the [Children].

Mother presents four points on appeal. Mother contends the trial court erred in terminating her parental rights because: (1) the abuse-and-neglect ground for termination was not supported by substantial evidence; (2) the failure-to-rectify ground for termination was not supported by substantial evidence in that there was enough evidence to support compliance with Mother's treatment plan, including therapy and parenting classes; (3) the finding that Mother was unfit to be a party to the parent-child relationship was not supported by substantial evidence in that there was no evidence that Mother suffers from a mental condition that prevents her from parenting the Children; and (4) the trial court abused its discretion by finding that termination was in each child's best interest.

The issues for our determination are:

1.     Was there substantial evidence supporting the termination of Mother's parental rights on a ground found by the trial court?

2.     Did the trial court abuse its discretion in finding that it was in the best interest of the Children for Mother's parental rights to be terminated?

10

**Standard of Review**

As our Supreme Court reconfirmed in *J.A.R.*, 426 S.W.3d at 626:

     'This Court reviews whether clear, cogent, and convincing evidence was presented to support a statutory ground for terminating parental rights under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Therefore, the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. The judgment will be reversed only if we are left with a firm belief that the order is wrong.

                      . . .

     After this Court determines that one or more statutory ground has been proven by clear, convincing, and cogent evidence, this Court must ask whether termination of parental rights was in the best interest of the child. At the trial level, the standard of proof for this best interest inquiry is a preponderance of the evidence; on appeal, the standard of review is abuse of discretion.'

*Id.* (quoting *In re Adoption of C.M.B.R.*, 332 S.W.3d 793 (Mo. banc 2011).

We will find abuse of discretion only where a trial court's ruling is "so arbitrary, unreasonable, and against the logic of the circumstances that it shocks the sense of justice and indicates a lack of careful consideration." *In re F.C.*, 211 S.W.3d 680, 684 (Mo.App. S.D. 2007).

### *Analysis of Abuse or Neglect Determination*

Mother claims there is no substantial evidence to support any of the three grounds for termination of parental rights found by the trial court. "To prevail on [a] substantial-evidence challenge, [Mother] must demonstrate that there is no evidence in the record tending to prove a fact that is necessary to sustain the circuit court's judgment as a matter of law." *Ivie v. Smith*, SC93872, 2014 WL 3107448, at *7 (Mo. July 8, 2014).

11

"The circuit court's judgment will be affirmed if the record supports at least one ground and supports that termination is in the best interest of the children." **J.A.R.**, 426 S.W.3d at 630. Because there is substantial evidence to support the trial court's determinations of abuse or neglect, as defined in section 210.110(2), this Court need not address Mother's additional challenges to the trial court's findings of failure to rectify and that Mother is unfit to be a party to the parent-child relationship because of a condition that renders her unable to care for the needs of the Children.

Section 211.447.5(2) provides that parental rights may be terminated if a child has been abused or neglected. "Neglect" is defined as "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being[.]" § 210.110(12). "Abuse" is defined as "any physical injury, sexual abuse, or emotional abuse inflicted on a child other than by accidental means by those responsible for the child's care, custody, and control, except that discipline including spanking, administered in a reasonable manner, shall not be construed to be abuse[.]" § 210.110(1).

In determining whether abuse or neglect has occurred, section 211.447.5(2)(d) provides that the court should consider and make factual findings regarding "conditions or acts of the parent" where "[r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development."

12

A court may rely on a parent's past behavior to find abuse or neglect, but in doing so, it must find that the past behavior is related to likely future conduct. *In re Q.A.H.*, 426 S.W.3d 7, 14 (Mo. banc 2014). "In this manner, the parent's past conduct may be good evidence of future behavior, but it must be convincingly linked to future behavior." *Id.* (internal quotation and citation omitted). "[T]he standard is a prospective analysis and considers whether there is a *likelihood* of future harm." *Id.* (emphasis in original). A parent's efforts to comply with treatment, remediation, parenting or reunification plans is *highly relevant evidence* for predicting future parental behavior. *In re K.A.W.*, 133 S.W.3d 1, 10 (Mo. banc 2004) (emphasis added). Similarly, "[a] lack of effort to comply with a plan, or a lack of success despite effort, can predict future problems. . . . Such evidence cannot be irrelevant." *Id.* (internal citation omitted).

The evidence viewed in the light most favorable to the trial court's judgments shows that Mother failed to provide the care and control necessary for the Children's physical, mental, or emotional health and development.

As an initial matter, we note the Children's Division made numerous and substantial efforts at reunification. There were two separate rounds of supervised visits, unsupervised visits, and permissive placements. Children's Division provided extensive services to Mother. James Snare, Children's Division worker, testified he provided Mother "probably more services than I've ever put in a home before." Mother was provided individual counseling, marriage counseling, parenting classes, and parent aides in her home to supervise visits with Children and to assist Mother with her parenting techniques. During permissive placement, there were between two and three Children's Division workers each providing two hours of assistance, five-

13

to-seven days a week. There was testimony that there were, quite plainly, no "additional services [the Children's Division] could provide."[9]

Mother demonstrated a lack of effort and lack of success in complying with her treatment plan. One requirement was that Mother was "[t]o obtain and maintain a stable and healthy residence that meets the standards of the community[,]" which included "not allow[ing] individuals to frequent or reside in her home who would pose a threat to her children . . . ." Despite the fact that one of the reasons the State initially took custody of the Children was that the Children witnessed domestic violence by Father against Mother, Mother reunited and cohabitated with Father during the first permissive placement. Domestic violence resumed, and the Children's Division was forced to remove the Children from the home. While we are sympathetic to Mother's plight as a victim of domestic violence, Mother's decision to reunite and cohabitate with Father directly violated a requirement of her treatment plan.

Another requirement of Mother's treatment plan was "[t]o provide safe parenting through appropriate discipline and physical interaction[,]" which included attending and actively participating in parenting classes. Mother still had not completed parenting classes a year after they were first ordered. By this time, there had already been two rounds of unsupervised and supervised visits and permissive placements. While Mother did eventually complete her parenting classes, it took over a year to do so even after losing the Children twice during that period of time.

Additionally, Mother failed throughout this time to administer appropriate discipline. There was evidence presented that Mother withheld food as punishment such that the Children

_____

[9] The trial court made specific note of this in its findings: "[Mother] has been referred for every service the Children's Division has at its disposal and that none of those services have resulted in any lasting change by [Mother]. There is little to no likelihood that repeating a service already provided would have any different result."

14

would go without food for seven-to-eight hours during the day. When a Children's Division worker indicated this was not appropriate, Mother did not seem to understand and became hostile. On one occasion, Mother restrained S.C. by holding him in her lap and twisting his arm. When a Children's Division worker told her this was not appropriate discipline, Mother said "that's the way she did things, [and] she wouldn't take any direction . . . not [to] do it like that." Mother threatened to "get the vinegar" to put in S.C.'s mouth. When told that this too could be considered abusive, Mother retorted that "she knew what she was doing, that everybody knew she did it."

Mother's hostility and refusal to comply with instruction as to how to administer appropriate discipline evidences Mother's lack of effort to comply with her treatment plan. Additionally, there was testimony that Mother had improved little, if at all, in her disciplinary techniques. Mother's lack of effort to comply and her ultimate failure to succeed in her treatment plan are "highly relevant evidence" for predicting her future parental behavior and "cannot be irrelevant." *In re K.A.W.*, 133 S.W.3d at 10.

In addition, Mother failed to provide the Children with food in an appropriate manner. Mother withheld food arbitrarily. The Children stated they did not receive enough food when in Mother's custody. When she did provide food, Mother intentionally sought to prepare foods the Children did not like, which caused the Children to cry and gag while eating.

Mother also failed to properly supervise the Children as the younger children would sometimes wander off without Mother knowing. When Children's Division workers discussed this safety issue with Mother, Mother did not appear to take the problem seriously.

When Children's Division workers were not in the home, "things would go back to normal," which involved "yelling and fighting" and "throwing knives and pots and pans." G.C. expressed concern with her "physical and emotional safety" while living with Mother.

Several psychologists and counselors evaluated and treated Mother and each of the Children. The psychologists were in agreement that the Children suffered from severe mental and emotional problems requiring ongoing individualized therapy and attention. Isabella Beeson ("Beeson"), a licensed counselor, opined that Mother failed to see any value in therapy for the Children and likely would not continue it if left to her. Beeson stated Mother felt "minimal empathy" toward the Children, exhibited little willingness to understand the Children's problems, and felt no responsibility for creating these problems. Beeson indicated that Mother's attitude was that once the Children were home, everything would be fine and there would be no need for individualized treatment or attention.

Children's Division workers also expressed concern that Mother felt "that if the [C]hildren were returned to her, that all of their issues and all of their problems would magically go away." Mother saw very little value in therapy and services for the Children, and Children's Division workers were fearful that Mother would discontinue those services if the Children were returned to her.

Mother was openly hostile and resistant to efforts made to improve her parenting techniques. She was untruthful with Children's Division workers about her compliance with their directives, and generally failed to implement their suggestions for improving her parenting. There was testimony that her overall parenting techniques improved little, if any, despite the extensive services and opportunities provided to her.

16

The numerous opportunities provided to Mother in this case, Mother's lack of effort and success in complying with her treatment plan, the unusually extensive services provided, Mother's hostility to efforts to improve her parenting techniques, Mother's untruthfulness and actual failure to comply with Children's Division workers' directives, Mother's actual lack of improvement in her parenting techniques, and testimony that Mother would not provide necessary mental health services for the Children in the future, are convincing evidence that Mother's parenting will not improve even if given additional opportunity. *In re Q.A.H.*, 426 S.W.3d at 14.

Mother's point challenges the trial court's judgments as not supported by substantial evidence, but her point and argument refer to evidence in her favor while ignoring unfavorable evidence. That ignores our standard of review. *See Ivie*, 2014 WL 3107448, at *9. Mother fails to show that there was no evidence in the record tending to prove that Mother abused or neglected the Children.

There was substantial evidence to support the trial court's judgments terminating Mother's parental rights due to abuse or neglect of the Children. Point denied.

### *Analysis of Best-Interest Determination*

Mother also claims there is insufficient evidence to support the trial court's determination that termination of parental rights was in the Children's best interest. "In any termination of parental rights, the primary concern is the best interest of the child." *J.A.R.*, 426 S.W.3d at 632.

In her recommendations to the trial court, Teresa Housholder, guardian ad litem for the Children stated that: (1) the Children were special needs children who, as a direct result of their parents' actions, would require significant resources to help them grow into healthy, productive young men and women; (2) Mother refused to acknowledge the Children's needs and chose to

17

believe the Children's problems would go away if the Children were returned to her; (3) Mother blamed the State for the Children's attachment disorders and other problems, and refused to take responsibility for the part her own actions played in her loss of custody; and (4) Mother repeatedly or continuously failed to provide the Children with adequate care, custody and control in that she failed to demonstrate appropriate parenting, and failed to rectify the conditions which brought the Children into State custody. These determinations are supported by the record.

In addressing the statutory best-interest considerations, the trial court found that:

- G.C. did not want to live with Mother and did not look forward to seeing her.

- F.C. "holds back and is not open with [M]other."

- M.C. and S.C. are "excited to see [their] siblings at visits, but seem[] ambivalent to [M]other [and have] no strong emotions either positively or negatively towards her. [They have] bonded with [their] placement[s] and view[] them as [their] mother and father."

- Mother had been referred for every service the Children's Division had at its disposal and that none of those services resulted in any lasting change by Mother. There was little to no likelihood that repeating a service already provided would have any different result.

- Mother had "demonstrated a disinterest in or a lack of commitment to the [Children] by continuing to disregard the [Children]'s feelings and by not making the changes required so that she could safely provide for the [Children]'s needs."

- Mother failed to take advantage of the services already offered to her.

- "The continuation of the parent-child relationship greatly diminishes the [C]hild[ren]'s prospects for early integration into a stable and permanent home."

These findings are also supported by the record.

Mother's argument on this point ignores the testimony and evidence favorable to the trial court's findings and conclusions and merely recites evidence and purported inferences favorable

18

to her position.  *See **Ivie***, 2014 WL 3107448, at *9.  Mother's failure to frame her challenge within our standard of review renders her argument on this point of no analytical value.

Based on evidence cited above, the trial court's ruling was not clearly against the logic of the circumstances and was not so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.  *See **In re F.C.***, 211 S.W.3d at 684.  The trial court did not abuse its discretion in finding that termination of Mother's parental rights was in the best interest of the Children.  Point denied.

The judgments of the trial court are affirmed.

WILLIAM W. FRANCIS, JR., C.J./P.J. - OPINION AUTHOR

JEFFREY W. BATES, J. - Concurs

DANIEL E. SCOTT, J. - Concurs