358 S.W.3d 549 (2012)
In the Interest of C.J.G., a male child under seventeen years of age.
Missouri Department of Social Services, Children's Division, and
The Dade County Juvenile Office, Petitioners-Respondents,
v.
C.B.G., Respondent-Appellant.
Nos. SD 31238, SD 31239.
Missouri Court of Appeals, Southern District, Division One.
January 30, 2012.
*550 Verna L. Haun, Bolivar, MO, for Appellant.
Judy R. Ullmann, Nevada, MO, for Minor Child C.J.G. (No brief filed.)
Lisa Abbott, Nevada, MO, for Respondent Dade County Juvenile Office. (No brief filed.)
Chris Koster, Attorney General, and Jeremiah J. Morgan, for Respondent Missouri Department of Social Services, Children's Division.
Before BURRELL, P.J., RAHMEYER, J., and LYNCH, J.
PER CURIAM.
C.B.G. ("Father") appeals the judgment terminating his parental rights to C.J.G., who was born in December of 2001, and was taken into protective custody two days later. C.J.G. has resided in the same foster home since that time. Although Father brings eighteen points on appeal, we address only those that are dispositive of the appeal. Because substantial evidence does not support either of the two grounds asserted in the petition for termination, we reverse the judgment terminating Father's parental rights.
This is a rare termination case in that many of the facts are not disputed. There is no question that, in 2001, both Mother *551 and Father had legal and personal problems. C.J.G. was taken from Mother[1] as a result of a hotline complaint that Mother had abused one of Father's older children who was residing in the home of Father and Mother. The older child was approximately eight years old at the time of the abuse and had bruises, including one in the shape of a belt buckle, on his back. Once Father discovered the bruises, he took the child to the hospital; however, the child was scared to go in and asked Father to just take him to eat instead. Father then called the child abuse hotline and reported the incident. There is no allegation that he in any way participated in the abuse or that he delayed in calling the hotline. Nevertheless, Father was advised by the Division of Children's Services ("the Children's Division") to take out an order of protection to get Mother out of the home. Father had full custody of his two older children by an earlier marriage; however, as a result of this incident, they initially went to foster care and thereafter resided with their biological mother in Arizona. Father was angry with Mother, followed through with pressing charges against her, and Mother was ultimately convicted of child abuse. She served a prison term of approximately two years.
Mother admits to the problems dealing with her anger and to alcohol and substance abuse. While in prison, Mother participated in the Parents as Teachers ("PAT") program,[2] went to individual counseling once a week, and participated in several twelve-week long self-help courses that met twice per week. She also obtained her GED and scored high enough to earn a full scholarship to a community college. Mother completed an outpatient substance abuse program and a treatment program for anger management while on parole, and has remained drug and alcohol free since her release from prison in 2004. Mother testified at trial that she has not abused alcohol or drugs since before she found out she was pregnant with C.J.G. There was no evidence to the contrary. Mother has no convictions since that time, is attending community college on Pell grants, works part-time as a transcriptionist, and is the mother of a five-year-old daughter.
A hotline call was received shortly after the birth of Mother and Father's daughter in 2005. The reporter stated "strong concerns regarding the parents['] history . . . that [Mother] has beat on [Father's] children. . . that [Father] has no visitation rights with his children . . . that [F]ather has worked with Intensive In home services and that [F]ather chose to move [M]other back into his home . . . that [M]other has had two children removed by the Children's Division . . . and that [M]other is very manipulative." After investigation, the hotline was coded as being "unsubstantiated-preventive services indicated," as it was noted that the family was in counseling at the time. The Children's Division worker who did the investigation testified that the home was clean, the environment was appropriate, and the child was well cared for.
Father had his own legal problems in 2001. He was charged with and convicted of assaulting a police officer and misdemeanor *552 DWI; while serving time in the county jail, he was later convicted of damaging jail property and sentenced to two years in prison. A worker for the Children's Division spoke with Father before C.J.G.'s birth and suggested that Father permit the adoption of the unborn child by a couple who could not have children.[3] Father refused. C.J.G. was born while Father was in prison.
Toward the end of 2003, Father lived in a halfway house. He used drugs and failed to follow the center's rules regarding length of time away from the center and thus went back to prison to finish out his prison sentence. While in prison, Father availed himself of the opportunity to better his life. He participated in Long Distance Dads, Parents' Fair Share, PAT, Future Fathers, and Proud Parents, as well as group and individual counseling. Brian Eads, the site coordinator for the federal grant program called Fathers for Life, testified that Father "came to our opening class as well as everything that I can remember that we offered. He was a faithful participant." Eads also stated that "[f]rom the very beginning Father showed leadership skills and was a tool for me to bring new people into the program. He was very good about going and telling guys and inviting them to our program to kind of see what was going on. . . . I would say he led the way." Father also participated in Victim's Impact Panel and completed the SATOP program, a twelve week 150-hour partial day treatment program for substance abuse. In addition, Father obtained his GED, took technical classes, and participated in Breaking the Barriers, which is an educational program geared toward helping someone come out of prison with the tools to succeed in society.
Father and Mother married in 2005, and their daughter was born later that year. Father testified he has not done drugs since 2003; he has not consumed alcohol since 2007. He remembers the day because his mother died that day and he received a DWI. There is no record of a conviction for the DWI, but Father admits to being stopped. Father was also attending college on Pell grants at the time of the hearing. He has had sporadic income as a construction worker. He has regularly attended the same church for over three years and has been an usher for over a year. He is actively involved with a food ministry, handing out food every month for over three years. He and Mother attend family counseling with Robin Pummel.
There is no need or time in this opinion to detail the continuous and constant requests of Father to be part of C.J.G.'s life for the past nine years. Suffice it to say he wrote constant letters to the Children's Division requesting updates, tried to send cards and gifts, sent books on tape that he had recorded, and requested visitation the entire time. Despite his requests, the only news he regularly received about C.J.G. was from Mother. Although Mother was in jail for the abuse of another child, she was allowed unsupervised visits for the nine months after C.J.G. was born and until Mother went to prison. She was allowed visitation while in prison and upon her release, and her parents were allowed unsupervised visitation. Father visited C.J.G. while he visited with Mother's parents. The Children's Division stopped visitation with Mother's parents when it discovered that Mother's parents were allowing Father to visit with the child. The visits with the grandparents were suspended in October 2003, but were *553 reinstated a few weeks later. The docket entry reads, "Visitation reinstated and emphasis that the [grandparents] are not to provide any contact with [Father] pending further order of court." There is no indication in the record why Father was not allowed any visitation, supervised or unsupervised.
Upon Mother's release from prison, the Children's Division ostensibly maintained a goal of reunification between C.J.G. and Mother, but had a "concurrent" goal of termination. In the Child Assessment and Service Plan completed November 3, 2003, and covering the period November 1, 2001, to November 1, 2003 (Exhibit 27), the case goal was changed to adoption. In the Children's Services Case Plan and Evaluation completed November 13, 2002 (Exhibit GG), the Children's Division recommended termination. Mother was incarcerated. In an Order of Permanency Planning (Exhibit 1) dated June 1, 2004, just prior to Mother's release, the court found that reunification was not in C.J.G.'s best interest and the permanency plan was changed to adoption by the foster parents.
The Children's Division filed its first petition for termination in 2003.[4] There was never a signed service agreement between Father and the Children's Division concerning C.J.G. After the first petition for termination of his parental rights was filed, the Children's Division sent a rough draft of an agreement to Father's attorney after Father requested that he be given time to confer with his attorney about it.[5] The Children's Division never offered or provided any services to Father per either service agreement.
A judgment terminating Father's parental rights was entered in 2006; that judgment was reversed by this Court for a failure to provide Father with the investigation and social study required by section 211.455 at least fifteen days prior to any dispositional hearing. In re C.G., 212 S.W.3d 218, 219 (Mo.App. S.D.2007). The Children's Division filed a second petition for termination, which was ultimately dismissed at the request of the Children's Division. In 2009, the Children's Division filed its third petition to terminate the parental rights of Father. The Children's Division workers consistently testified that they were "relieved" of any duty to provide services to Father by their termination requests to the court. The court entered an amended judgment on March 21, 2011, terminating Father's parental rights. That judgment is the subject of this appeal.
The court found two statutory grounds for termination: neglect and a failure to rectify.
As to neglect, the court found the child had been neglected pursuant to section 211.447.5(2),[6] in that Father:
suffers from a chemical dependency which prevents presumed father from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable presumed father to consistently provide such care, custody and control in that Father admitted to a long-term drug involved lifestyle and failed to complete requested drug treatment following his release from prison in 2003
and
that there has been a repeated or continuous failure by [F]ather, although *554 physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development in that Father, although ordered to pay child support, has provided only nominal financial or in-kind support for the child. Father is not disable[d], has admitted to working at times, and has provided for a younger minor child in his home.
On the second ground, the failure to rectify, pursuant to section 211.447.5(3), the condition which led to the assumption of jurisdiction which still exists is:
Father remains married to and lives with the woman who was convicted of the Class C Felony of Abuse of Child in which the victim was a sibling to the minor child . . . [and] that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to Father in the near future.
Additionally, the court found:
[F]ather fails to progress in complying with the terms of the social service plan which was faxed to Father's legal counsel on October 27, 2003[,] and presented to Father at a Family Support Team Meeting on November 3, 2003 (more than seven years ago), and which Father refused to sign or participate in; specifically the court finds that Father failed to complete drug and alcohol treatment, a psychological evaluation, or anger management classes.
[The] Children's Division is unsuccessful in aiding the presumed father in adjusting his circumstances or conduct in that Father refused to cooperate with the provision of services[.]
. . . .
[T]here is clear[,] cogent and convincing evidence that presumed father suffers from a chemical dependency which prevents presumed father from consistently providing the necessary care, custody and control of child and which cannot be treated so as to enable presumed father to consistently provide such care, custody and control.
In a determination of the additional factors concerning the child's best interests, pursuant to section 211.447.7, the court found:
The child has few, if any[,] emotional ties to [F]ather and continuation of the relationship is detrimental to the child. The child, now nine years old, has been in foster care since two days after birth;
Presumed father fails to maintain regular visitation or other contact with the child, albeit unable to do so in light of Court ordered restrictions;
Presumed father provides only nominal voluntary support for the cost of care and maintenance of the child when physically able to work and financially able to do so including the time that the child is in the custody of the Division or other child-placing agency;
Additional services are not likely to bring about a lasting parental adjustment enabling a return of the child to presumed father within an ascertainable period of time. Father had failed to sign or perform requests in a written service agreement in November of 2003 and has given no indication of a desire to do otherwise;
Father evidences a disinterest in or lack of commitment to the child, thru [sic] his purposeful failure to sign and comply with the social service agreement. Father's conduct after filing of the petition has been given its proper weight by the Court.
*555 Our standard of review was set forth in In re D.O., 315 S.W.3d 406 (Mo.App. S.D. 2010):
"Clear, cogent and convincing evidence in an action for termination of parental rights is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." In re A.H., 9 S.W.3d at 59. This court will affirm a judgment terminating parental rights unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005) (citing Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976)); In re T.A.S., 62 S.W.3d at 655 (citing In re N.M.J., 24 S.W.3d 771, 777 (Mo.App. W.D.2000)). "We must be extremely cautious in considering the setting aside of a judgment on the ground that it is against the weight of the evidence. We should do so only if we have a firm belief that the judgment is wrong." In re W.S.M., 845 S.W.2d 147, 150 (Mo.App. W.D.1993).
"We review termination of parental rights cases closely because termination of parental rights interferes with a basic liberty, freedom from governmental interference with family and child rearing." In re C.K., 221 S.W.3d at 471. "Terminating parental rights is an exercise of an awesome power and should not be done lightly." Id. (quoting In re P.C., 62 S.W.3d 600, 602-03 (Mo.App. W.D.2001)). "Statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." In re K.A.W., 133 S.W.3d 1, 12 (Mo.2004). "Strict and literal compliance with the statutory requirements, relating to termination of parental rights, is necessary." In re F.M., 979 S.W.2d 944, 946 (Mo.App. S.D. 1998).
. . . .
"Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." [In re K.A.W., 133 S.W.3d] at 9-10. "Courts have required that abuse or neglect sufficient to support termination under section 211.447.4(2) be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." Id. at 10; see also In re C.A.L., 228 S.W.3d 77, 80 (Mo.App. S.D.2007).
Id. at 414, 416-17.
As we have noted, Father claims eighteen points of error on appeal: fifteen of those challenge the two statutory grounds on which the termination is based. For ease of discussion, we will separate the discussion into the two statutory grounds the trial court found had been met. We shall first address the court's findings concerning neglect. In our discussions, we are mindful that we must find that the neglect be based at the time of termination, not at the time jurisdiction was initially taken.
First, the trial court found that Father suffers from a chemical dependency which prevents him from consistently providing the necessary care, custody and control of C.J.G. There simply is no evidence supporting that finding. Certainly, based upon Father's admissions and the misdemeanor DWI in 2001, and a subsequent possession in the halfway house of narcotics, Father had a chemical dependency; however, there was no evidence in the record that Father continues to suffer *556 from any chemical dependency. Even if the court found Father's testimony that he has not used any drugs since 2003, or used alcohol since 2007, to be unpersuasive, the Children's Division did not present any evidence of a current "long-term drug involved lifestyle." In fact, all of the evidence was to the contrary.
Father is married, is successfully raising a child, is attending college and has acknowledged his past mistakes. Based on the evidence presented, Father would be considered a "success" story of rehabilitation after prison. Contrary to the court's findings, Father participated in counseling in many different forms. Both parents have been in therapy with Robin Pummel since their release from prison. Father testified that he did anger management and family counseling with her. That counseling was verified by the Children's Division worker who investigated the unsubstantiated hotline about Father's infant daughter. Father also testified that he completed anger management counseling while in prison, and that counseling was part of his 150-hour treatment program. He produced completion certificates (Exhibit Y) for the substance abuse program and Parallel Universe (levels 1 and 2), which was "based on institutional conduct, progress, and successful completion and participation in institutional programs." The Children's Division introduced no evidence that it had any reason to request or that it requested Father to seek further drug treatment following his release from prison in 2003. He tested negative the only time the Children's Division requested drug testing.
Likewise, there is not substantial evidence that Father failed to provide adequate "food, clothing, shelter or education as defined by law." The court noted the token payments of support. Although the evidence indicated that Father had provided $3,190 himself toward the arrearages of $12,714, there was additional evidence that Mother has also paid $5,170.71 in child support. Of that amount, at least $3,445 was taken as income tax intercepts. Father and Mother combine their income and their expenses, thus, substantial family income has gone to contribute to the care of C.J.G. As the court stated in In re S.M.H., 160 S.W.3d 355 (Mo. banc 2005):
If a parent is unable to pay for all of a child's financial needs, he or she has a duty to provide as much as he or she reasonably can. Evidence that a parent has provided some contribution, even if not fully sufficient for support, demonstrates the parent's intent to continue the parent-child relationship and militates against termination.
Id. at 367 (internal citations omitted).
The court found Father to be indigent. Despite this, Father and Mother are adequately caring for their second child, who has a severe medical issue.[7] Father has not worked regularly and claims he has struggled for work in this very slow economy. Mother testified that her work load as a medical transcriptionist is dependent upon the number of patients her employer sees at any given time and "they get more work throughout the summer." The ability to support a child who is not in foster care supports the finding that the parent would be able to provide financially for the child in foster care in the future. In re C.A.L., 228 S.W.3d 66, 71 (Mo.App. S.D.2007). The trial court's determination that parental termination was warranted because of neglect was not based on substantial evidence of Father's current conduct. Father's points relating *557 to the lack of substantial evidence supporting a finding for termination pursuant to section 211.447.4(2) are well taken.
Likewise, substantial evidence does not support a finding that Father failed to rectify the conditions that led to the assumption of jurisdiction. The condition that led to the assumption of jurisdiction was that Father was in jail at the time of the child's birth. Had that condition not been present, there was absolutely no other evidence that Father would not have been caring for C.J.G. Father immediately attempted to seek medical care for his son, he called in the hotline complaint against his then paramour immediately, and he adamantly supported pressing charges against her. The charges of misdemeanor DWI and assaulting a police officer alone would not have led to the child being taken by the State and placed into foster care. Clearly, Father is not in jail at this time and has not been since 2004.
The court found that the harmful condition was that Father is married to Mother, who was convicted of the class C felony of abuse of a child. To determine that the marriage and cohabitation with his wife is a condition that Father has failed to rectify, the court must have determined Father's parental rights should be terminated because just being with Mother was "potentially harmful" to C.J.G. Substantial evidence does not support that finding.
The evidence indicates that even the Children's Division did not believe that contact with Mother was potentially harmful to the child. Immediately after the abuse of Father's older child, the Children's Division allowed Mother unsupervised visits with C.J.G. They continued to bring the child to prison to participate in parenting programs. Mother successfully completed those programs. After her release from prison, Mother again was allowed visitation with C.J.G. There was absolutely no evidence presented that the presence of Mother in Father and Mother's home creates any potential danger to C.J.G. The evidence was that Father and Mother's daughter is well cared for, that the home is appropriate, and that Mother is appropriate with the child. Reliance upon a conviction in 2001 for the abuse of another child does not support a finding that a condition of a potentially harmful nature continues to exist.[8] Father's continued marriage with Mother is not a potentially harmful condition that Father has failed to rectify.
The court additionally noted Father's failure to progress in complying with the terms of the social service plan. The Children's Division relies upon the failure to sign a "written service plan." The statute does not provide that parental rights may be terminated for failing to sign a service plan. It is not the plan that is important, it is the underlying conditions. As we noted above, there was no evidence presented that Father was ever requested to complete drug and alcohol treatment, that he refused to do so, or that he had a need for drug and alcohol treatment at the time of the termination hearing.
The court noted that Father had not had a psychological evaluation as the unsigned plan called for a psychological evaluation. There was no indication that Father needs a psychological evaluation. The Children's Division did not request a psychological evaluation. The plan from 2002 indicated Father was to take anger management classes. He did so. There was no indication that Father needed anger *558 management classes at the time of termination. Aside from the original assault and property destruction charges, there was no evidence that Father has had further confrontations with law enforcement and no evidence of inappropriate anger. There were no indications that drugs, alcohol, or anger were potentially harmful conditions at issue in Father's life at the time of the hearing. To reiterate, the service plan is only a written documentation of underlying issues that the Children's Division and the parent agree must be addressed for the child's benefit. The failure to sign a service plan proposed by the Children's Division is not in and of itself a basis to terminate Father's parental rights.
It is important to note that "`[A] parent's failure to comply with a written service agreement does not, in itself, constitute a ground for termination [of] parental rights.'" In re S.T.C., 165 S.W.3d 505, 516 (Mo.App. S.D.2005) (quoting In re C.N.G., 109 S.W.3d 702, 707 (Mo.App. W.D.2003)). Rather, it is only a factor to be considered in determining whether grounds for termination exist under § 211.447.4(3). Id.

In re C.A.L., 228 S.W.3d at 73. The need to rectify the conditions that led to the service agreement is the real issue.
Finally, the court found the Children's Division was "unsuccessful in aiding the presumed father in adjusting his circumstances or conduct in that Father refused to cooperate with the provision of services." There is no substantial evidence that the Children's Division offered services to Father at any time, but certainly not since 2004. It is undisputed that they did not offer any counseling, evaluations, or visitation with C.J.G.
Further, substantial evidence does not support termination on the additional factors to be considered by the court pursuant to section 211.447.7. The court found that the child had few, if any, emotional ties to Father and Father failed to maintain regular visitation or other contact with the child. We have not included in this opinion a rendition of the countless exhibits including letters, requests, requests by attorneys, and pleadings that Father has pursued in order to have a relationship with his son. It was totally within the prerogative of the Children's Division to foster a relationship between Father and the child; they did not do so. It would not be appropriate to hold against Father the fact that he did everything he could do to foster the relationship but did not have the power to unilaterally achieve it in the face of the Children's Division's power to deny it. The Children's Division first filed a termination request in 2003. Although the court found that additional services were not likely to bring about a lasting parental adjustment, it is impossible to determine that because no services have been offered. In fact, it is not clear what adjustments are necessary.
For the reasons outlined herein, we are firmly convinced that the judgment is wrong in concluding that the allegations of the petition were true and that a termination of Father's parental rights to C.J.G. was correct. The evidence "simply does not instantly tilt the scales in favor of termination when weighed against the evidence in opposition." In re T.A.S., 62 S.W.3d 650, 661 (Mo.App. W.D.2001) (internal citation omitted). The judgment terminating Father's parental rights is reversed.
Two further matters remain in the appeal. The first is Father's claim that the Children's Division erred in refusing to permit Father to have contact with C.J.G. because substantial evidence does not support a finding that contact would provide a substantial risk of physical or emotional *559 harm. The order that is appealed from occurred after the termination hearing and was an Order of a Permanency Plan, which denied the motion for visitation and/or correspondence, and found it in the best interest of the child to continue the permanency plan of adoption. The trial court did not have the benefit of this Court's decision regarding termination when it denied Father visitation with his son. Although Father is correct that there was not substantial evidence that harm would come to C.J.G. if visitation were to occur, especially in light of the evidence that C.J.G. has met with his half siblings and C.J.G.'s knowledge of Father's interest in him, we will remand to the trial court for further determinations concerning visitation. Father's point is denied.
The final matter claims trial court error in ordering Father to pay one-half of the cost of his court-appointed counsel's fee. The point has merit. Section 211.462 assigns the responsibility for the payment of such costs to the county or agency having legal or actual custody of the child. The trial court was without authority to assess costs against Father. The judgment ordering Father to pay one-half of his counsel's attorney fees in the Order of Permanency Plan dated February 23, 2011, is reversed.
Father's court-appointed counsel has filed a Motion for Attorney Fees on Appeal. The motion is sustained. Although we have the expertise and authority to fix the amount of attorney fees on appeal, the trial court is in a much better position to hear evidence and argument on this issue and make a determination of the reasonableness of the requested fee; therefore, we prefer, in this case, to defer our authority to the trial court. In re C.G., 212 S.W.3d at 225. We remand this issue to the trial court with directions to conduct a hearing to determine the reasonableness of the attorney fees requested on appeal by Father's counsel and enter judgment accordingly.
NOTES
[1] We refer to C.J.G.'s mother as Mother even though her parental rights were terminated as a result of her failing to perfect her appeal. Because Father's relationship with Mother is used in one basis the trial court used to justify Father's termination, we necessarily must discuss evidence relating to her.
[2] The PAT program was described at trial as a voluntary program to help offenders with parenting skills and to provide education on child development.
[3] The couple is the same couple who have been foster parents to C.J.G. the entire time he has been in custody.
[4] In re C.G., 212 S.W.3d 218, 220 (Mo.App. S.D.2007).
[5] The Children's Division contends that they used as guidance a written service agreement that Father had signed for his two older children.
[6] All references to statutes are to RSMo Cum. Supp.2007, unless otherwise specified.
[7] Evidence was adduced that Father and Mother's daughter has a genetic eye condition which has caused significant expense in trips to a specialist in Kansas City.
[8] It is not clear from the record why the Children's Division has never tried to reunify Father, who rightly brought the abuse to the attention of the Children's Division, with C.J.G., and yet tried to reunify Mother and C.J.G.