**In the Interest of P.J., a minor,**

**S.L.J., Appellant,**

v.

**Greene County Juvenile Office, Respondent.**

No. SD 31955.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 28, 2012.

Motion for Rehearing and Transfer Denied Dec. 17, 2012.

John E. Kelly, for Appellant.

William C. Prince, Springfield, MO, for Respondent.

DANIEL E. SCOTT, P.J.

Appellant (Mother) challenges the termination of her parental rights with respect to her son (Child). For reasons stated herein, we reverse that part of the judgment.[1]

## Background

In April 2010, the Children's Division learned that Mother and her boyfriend were making methamphetamine in their apartment. Child, age 4, was removed from the home and temporarily placed with Mother's mother (Grandmother) with instructions to keep Child away from the apartment.

Within a month, authorities discovered Child back at the apartment.[2] Finding meth lab components and smelling marijuana, they arrested the adults and took Child into protective custody.

---

1. The unknown biological father's parental rights terminated by the same judgment are not at issue in this appeal or affected by our disposition.

2. There was testimony that Grandmother became frustrated and returned Child without notifying the Children's Division.

Child went to foster care where he has thrived. Mother pleaded guilty to child endangerment and drug felonies and went to prison. She was released in April 2011 and moved in with Grandmother.

Two months later, Respondent petitioned to terminate Mother's parental rights, citing abuse/neglect and failure to rectify.[3] After the court overruled a caseworker's recommendation to give Mother additional time, a termination hearing was held in January 2012.

Mother, as noted *infra*, seemed to have rectified the conditions that brought Child into juvenile care. Respondent thus focused its case on Mother's inability to support Child or herself and her dependence upon Grandmother.

Mother still lived with Grandmother as of trial. The home was drug-free and did not present safety issues, but Child's caseworker wanted Mother to get her own place, which Mother had been reluctant to do.

An issue related to independence was employment. Without a job for eight months after she left prison, Mother became employed a month before trial. Unemployment had been a problem throughout Mother's life, but felony convictions and missing teeth[4] now raised further challenges.

At least two witnesses expressed concern about Mother's parenting skills; one flatly said that Mother could not parent Child without help at this point. Mother had completed parenting classes, was interested in Child, and visited him whenever she could. Still, Mother could not parent Child without assistance or supervision, and had progressed only to twice-weekly, one-hour, supervised visits as of the trial date. Sometimes Mother brought Grandmother to these visits and relied on her to enforce boundaries with Child. Child's caseworker noted Mother's failure to progress in parenting skills, an inability to recognize safety concerns, and a lack of interaction with Child during visits. Child seemed to treat Mother more as a sibling than a parent.

Mental health experts described Mother's struggles with dependency and self-motivation. A psychologist mentioned de-motivational syndrome; some persons, even when they stop abusing drugs, "still just lack the energy to get up and get going." A therapist reported that Mother had done "very well" in her drug treatment, but needed more progress toward self-dependence and could not yet support herself. The therapist indicated that Mother, and perhaps "any client or anyone" in Mother's situation, reasonably needed one year to address her various issues.

Against these barriers to reunification, Mother had substantially complied with her treatment plan and demonstrated "praiseworthy" changes. She completed a drug treatment program, was involved in an intensive drug court program, and had been consistently drug-free. Mother had a long history of codependent relationships with abusive, substance-dependent men, but had avoided these since Child went into care. Mother completed a psychological evaluation, consistently participated in individual counseling and family therapy, stayed in contact with her caseworker and

3. *See,* respectively, § 211.447.5(2) & (3). "Failure to rectify" is the latter ground's common label. *In re C.A.L.,* 228 S.W.3d 66, 73 (Mo.App.2007). Statutory citations are RSMo 2011 Cum.Supp.

4. Mother lost her teeth due to methamphetamine abuse. She was fitted with dentures in the fall of 2011.

her probation officer, and complied with all terms of her probation.

The trial court terminated Mother's parental rights, giving rise to this appeal.

## Legal Principles

 As stated in *In Interest of K.W.*, 167 S.W.3d 206, 209 (Mo.App.2005):

Our standard of review in this case is based on the requirements of section 211.447.5: the trial court must find by clear, cogent and convincing evidence that one or more statutory grounds for termination exists and that termination is in the best interests of the children. *See In re P.L.O.*, 131 S.W.3d 782, 788–89 (Mo. banc 2004). The trial court's determination that a statutory ground has been proven by clear, cogent and convincing evidence will be affirmed unless no substantial evidence supports it, it is contrary to the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 789. Evidence is clear, cogent and convincing if it "instantly tips the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004). "In all of these determinations, the reviewing court is deferential to the fact-findings of the trial court and considers all the evidence and reasonable inferences from the evidence in the light most favorable to the judgment." *P.L.O.*, 131 S.W.3d at 789.

Because there are constitutional implications when a court severs the parent-child relationship, we must examine the trial court's findings and conclusions closely and strictly construe the statute in favor of preserving that relationship. *Id.* at 210; *K.A.W.*, 133 S.W.3d at 12.

## Point I—Abuse/Neglect [5]

 Respondent offered no proof that Mother abused Child, and the court found there was no evidence that Child had been subjected to physical, emotional, or sexual abuse.

The court's neglect finding fails per *K.A.W.* and its progeny. Trial evidence cited by the court almost exclusively dated back to Child's initial entry into care. Such past behavior was not "convincingly linked to predicted future behavior" and we find no "explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *Id.* at 9–10.

"Because the trial court's termination judgment as to Mother based on abuse/neglect is not supported by substantial evidence of a convincing link between Mother's previous [neglect] and the likelihood of her future danger to Child, Mother's first point is granted." *In re X.D.G.*, 340 S.W.3d 607, 621 (Mo.App.2011).

## Point II—Failure to Rectify

Child having been under juvenile court jurisdiction for a year, this termination ground required clear and convincing proof that:

1. The conditions that brought Child into care still persisted, *or* that other potentially harmful conditions still existed;

5. Although § 211.447.5(2) lists both "abuse" and "neglect," they are distinct concepts. The former involves non-accidental physical injury, sexual abuse, or emotional abuse; the latter means "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." *Compare* § 210.110(1) & (12).

*and*

2. Those conditions were unlikely to be remedied soon enough for Child to be returned to Mother in the near future, *or* that continuation of their parent-child relationship would greatly diminish Child's prospects for early integration into a stable and permanent home.

*See In re T.A.L.,* 328 S.W.3d 238, 247 (Mo.App.2010); § 211.447.5(3).

Mother rectified the conditions that brought Child into care—making meth in the home, Mother's drug abuse, and Mother's codependency with her drug-abusing boyfriend—so the contested issues were whether potentially harmful conditions still existed, and if so, whether the second element could be proved.

■ The judgment indicates three somewhat related [6] conditions of a potentially harmful nature: Mother's dependence on Grandmother, Mother's inability to provide for herself and for Child, and Mother's lack of parenting skills. The problem is that "nothing in section 211.447 ... allows a circuit court to terminate parental rights because, without assistance, a parent lacks the ability to care for the child." *In re A.S.W.,* 137 S.W.3d 448, 453 (Mo. banc 2004). Thus, nothing in the statute requires Mother to show that she can raise Child "by h[er]self in order to avoid a termination of parental rights." *In re S.M.H.,* 160 S.W.3d 355, 370 (Mo. banc 2005). "Parenting is frequently a group effort. Children are often raised with extensive help from grandparents...." *A.S.W.,* 137 S.W.3d at 453. As noted in *S.M.H.,* 160 S.W.3d at 370, "*A.S.W.* held that the fact that [a] father's mental condition made him unable to care for his child alone did not support termination of his parental rights where he had arranged assistance in caring for his son."

The proffered distinction here—hardly voiced at trial, fleetingly mentioned in the judgment, and barely argued on appeal—is the suggestion that Grandmother *herself,* and her presence if Mother and Child were to live in her home, posed a potentially harmful condition.[7] This concern, which the judgment (and trial record as we read it) attributes solely to "the incidents that led to protective custody being taken," shares the same fatal flaws as the neglect finding rejected under Point I. We find no effort to show a "convincing link," and certainly no "explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *K.A.W.,* 133 S.W.3d at 9–10. *K.A.W.* does not allow us, and did not allow the trial court, to indulge the "harmful Grandmother" assumption that might distinguish this case from *A.S.W.* and *S.M.H.* Whether or not potentially harmful conditions still existed, we are unable to find any proven by evidence consistent with the case law we have

---

6. In testifying about Mother's parenting deficiencies, a counselor noted that:

> in fairness to [Mother], I don't think she has had to parent him. And we discussed that. She was pregnant and living at home and had—had [Child] and then I think lived a couple more years, and so grandma was the—the figure of discipline at that time, although she was in the house. I've seen this happen in other situations, where the grandparent usually takes a lead in the role because they've done it before.

7. Quoting the trial court's judgment: "Since approximately April of 2011 [Mother] has resided with her mother. That is the same individual who returned the child to [Mother] and her paramour during the incidents that led to protective custody being taken." Quoting Respondent's brief: "At the time of the trial [Mother] continued to reside with her mother, the same individual who had returned the child to [Mother] and her paramour."

cited.[8]

■ Even if we could find otherwise, we still could not affirm, as the central question then would be whether "additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time." *A.S.W.,* 137 S.W.3d at 453; § 211.447.7(4). We have carefully reviewed the record and find, as in *A.S.W.,* "there is no evidence that additional services would fail or be unavailable." *Id.*[9]

■ Although the law does not afford Mother limitless time to provide the permanent and stable home that Child deserves (*In re Z.L.R.,* 347 S.W.3d 601, 608 (Mo.App.2011)), parental rights are a fundamental liberty interest and termination statutes "are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *A.S.W.,* 137 S.W.3d at 453. It cannot be said *on this record* that the remaining barriers to reunification cannot be remedied at an early date, or that additional time and services would greatly diminish Child's prospects for early integration into a stable and permanent home. We must grant Point II.

### Conclusion

The trial court's abuse/neglect finding was not supported by substantial evidence per *K.A.W.* As of the trial date, Mother had rectified the conditions that brought Child into care. Mother's dependence on Grandmother did not *per se* justify termination of parental rights. Mother had addressed many, but not all, barriers to reunification. From the record before us, we are unable to find that the remaining barriers could not be addressed at an early date. Reversal is required.[10]

Our disposition does not affect custody of Child or the trial court's jurisdiction over him, nor does it foreclose future proceedings to terminate Mother's parental rights. *X.D.G.,* 340 S.W.3d at 622–23; *K.W.,* 167 S.W.3d at 216 n. 8. Based on this record, it may be difficult for Mother to improve so that reunification is possible, and "even if reunification is possible at some point in the future, it may be that Mother will always need help in raising [Child]; however, that Mother needs help does not mandate termination of her parental rights." *T.A.L.,* 328 S.W.3d at 253.

We reverse that portion of the judgment terminating Mother's parental rights.

JEFFREY W. BATES, J. and DON E. BURRELL, C.J., concur.

8. *See also In re C.J.G.,* 358 S.W.3d 549, 557 (Mo.App.2012) (reliance upon Mother's prior conviction for abuse of another child did not support finding that her continued marriage to Father was a potentially harmful condition that Father had failed to rectify).

9. Nor were we aided by the trial court's failure to make any finding, as required by § 211.447.7(4) and requested in Respondent's petition, about the efficacy of additional services. If a primary problem is Mother's "need of significant ongoing parenting assistance[, i]t is error to fail to consider and make findings about failed, successful or possible future efforts to satisfy that need." *A.S.W.,* 137 S.W.3d at 454. This is especially true here, as one of Respondent's witnesses described beneficial services that may have been available.

10. As Points I and II are well taken, we need not reach the best interest determination challenged in Point III. *In re L.J.D.,* 352 S.W.3d 658, 675 (Mo.App.2011).