

# Missouri Court of Appeals

## Southern District

### Division One

IN THE INTEREST OF M.A.M., D.T.M., )
and W.V.M., Minors, )
 )
BUTLER COUNTY JUVENILE OFFICE, )
and MISSOURI DEPARTMENT OF )
SOCIAL SERVICES, CHILDREN'S )
DIVISION, )
 )
    Petitioners-Respondents, )
 )
v. )
 ) Nos. SD34226, SD34227, SD34228
M.D.M., Mother, ) (Consolidated)
 )
    Respondent-Appellant. ) **Filed: Nov. 3, 2016**

APPEAL FROM THE CIRCUIT COURT OF BUTLER COUNTY

Honorable John H. Bloodworth

**<u>REVERSED</u>**

M.D.M. ("Mother") appeals the judgments that terminated her parental rights in,

to, and over her children, M.A.M., D.T.M., and W.V.M. ("the Children").[1]  The trial

court found that Mother had neglected M.A.M., abused and neglected D.T.M. and

---

[1] The judgments also terminated the parental rights of the Children's father ("Father"), who is not a party to this appeal.  As a result, we make no determination of the propriety of the termination of his parental rights and will refer to evidence about Father only as necessary to address Mother's point on appeal.

1

W.V.M.,[2] and failed to rectify the conditions that caused the trial court to assume jurisdiction over the Children.[3] Mother presents three points, but we need decide only her assertion that the judgments were not supported by substantial evidence of a convincing link between Mother's past behavior, her conduct at the time of the termination hearing, and a likelihood of future harm to the Children. Finding merit in that claim, we reverse the portions of the judgments applicable to Mother.

### Governing Law & Applicable Standard of Review

"A parent's right to raise her children is a fundamental liberty interest protected by the constitutional guarantee of due process. It is one of the oldest fundamental liberty interests recognized by the United States Supreme Court." *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004). As a result, "appellate courts must examine the trial court's findings of fact and conclusions of law closely." *Id.*

We will affirm a judgment terminating parental rights "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011).

To prevail, Mother must demonstrate that no evidence in the record tends to prove a fact necessary to uphold the trial court's judgment as a matter of law. *In re G.C.*, 443 S.W.3d 738, 746 (Mo. App. S.D. 2014). We view conflicting evidence in the light most favorable to the judgment, and we disregard evidence contrary to the judgment. *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 626, 626 n.4 (Mo. banc 2014). The trial court may believe all, some, or none of the evidence, and our role is not to re-evaluate the evidence through our

---

[2] *See* section 211.447.5(2). All statutory references are to RSMo Noncum. Supp. 2014.
[3] *See* section 211.447.5(3), the termination ground typically referred to as "failure to rectify."

own perspective. *Id.* at 627. "We are bound by the trial court's factual findings if supported by substantial evidence." *McAllister v. McAllister*, 101 S.W.3d 287, 290 (Mo. App. E.D. 2003).

## The Evidence

On May 15, 2014, the Children's babysitter, Lisa Wills ("Babysitter"), drove Mother, D.T.M., and W.V.M. to the Women, Infants, and Children ("WIC") office in Poplar Bluff. Before departing from Mother's home, Babysitter noticed a bruise on W.V.M.'s hand. Mother told Babysitter that W.V.M. had fallen out of her high chair, and Mother claimed to have taken W.V.M. to the emergency room the night she fell. After the group arrived at the WIC office, W.V.M's pant leg came up, and WIC personnel noticed bruising on W.V.M.'s leg. Mother gave WIC personnel the same explanation for the bruising that she had given to Babysitter.

After the group left the WIC office, Mother received a telephone call from the Children's Division of the Missouri Department of Social Services ("the Division") asking Mother and W.V.M. to come to the Division's office, and Mother did so. The Division asked Babysitter and Mother to take W.V.M. to Dr. Claudia Preuschoff's ("Dr. Preuschoff") office for an examination.

At Dr. Preuschoff's office, Mother again claimed that W.V.M. had fallen out of her high chair. Upon Mother's request, Babysitter left Dr. Preuschoff's office to pick up M.A.M. from school. When Babysitter returned with M.A.M, Mother and M.A.M. went to the restroom. While they were gone, Babysitter lifted W.V.M's shirt and observed that the child's back, ribs, and buttocks were also bruised.

Dr. Preuschoff's examination revealed extensive bruising over multiple areas of W.V.M.'s body, and she opined that the bruises were the result of non-accidental trauma. Dr. Preuschoff's testimony from another hearing was admitted into evidence, and in addition to the bruising, she described some lesions on D.T.M.'s vaginal area as consistent with being "made from some object[.]" Her examination also revealed that W.V.M.'s eyes were sunken, and portions of W.V.M.'s scalp were hairless. W.V.M. was "far behind" on immunizations and suffered from a recent, unexplained weight loss. Dr. Preuschoff planned to take W.V.M. into protective custody unless Mother agreed to transfer her by ambulance to St. Louis Children's Hospital. Mother acquiesced, and W.V.M. was transported that same day. The doctor classified W.V.M.'s abuse as "[s]evere."

Dr. Preuschoff also contacted Valerie Guffey ("Ms. Guffey"), a supervisor in the Division's abuse and neglect unit, and Ms. Guffey investigated the family home. She saw a gallon of urine in the bedroom, and urine and/or food stains covered the walls. She also found garbage, debris, and old food spread throughout the home.

At the direction of the Division, M.A.M. and D.T.M. were removed from Mother and Father's home and placed with Babysitter. The next day, the Division directed Babysitter to bring M.A.M. and D.T.M. to the Division's office. Babysitter brought the Children in as directed, and she saw Mother speaking with a sheriff's deputy. Mother later left with the deputy, and Babysitter was allowed to take the Children home with her.

Mother later admitted to Babysitter that W.V.M.'s injuries were not incurred in an accidental fall. Mother stated that Father had whipped W.V.M. with a belt the night before they had gone to the WIC offices. Mother also told Babysitter about other

4

incidents of abuse that Father had inflicted on both Mother and the Children, including an incident in which Father rubbed dirty diapers in the faces of W.V.M. and D.T.M. and poured cold water on them.

In July 2014, Mother told her family support team that Father had abused her at least ten times at various points in the past. During an incident in 2012 ("the 2012 incident"), Father hit Mother in the face, "busting [her] eye open." D.T.M., who had been in Mother's arms at the time, suffered a black eye. Father was jailed for the 2012 incident, and he underwent anger management counseling. With the exception of the 2012 incident, Mother did not tell Babysitter, her family, or the authorities about any of Father's violent acts until after the Children were taken into the Division's care.

The Division offered Mother a written services agreement ("services agreement") on June 9, 2014 that set forth three goals: child well-being (to be accomplished by Mother keeping all visits); family health (to be accomplished by Mother engaging in counseling); and parent capabilities (to be accomplished by Mother engaging in random drug screenings). Because Mother wanted to consult with her attorney before signing, she did not sign the agreement until July 17, 2014. The services agreement did not specify any details regarding Mother's counseling; it simply provided: "Mother wishes to engage in counseling[.]"

After the Children came into care, Father was arrested and charged with serious physical abuse of W.V.M. Mother moved across the Missouri border into Arkansas at the end of May 2014. Mother also filed a petition to dissolve her marriage to Father on July 8, 2014, and an interlocutory decree of dissolution followed in September 2014.

After the Division concluded its investigation, it issued a report substantiating the allegations that Mother had neglected the Children and had failed to protect them by failing to report Father's abuse of the Children. After a July 18, 2014 adjudication hearing, the trial court took jurisdiction over the Children and placed them into the legal and physical custody of the Division.

The month after the trial court took jurisdiction over the Children, the permanency planning goal was changed from reunification with Mother to termination of parental rights. After this change occurred, a new services agreement was not entered into with Mother, and further services to her were not to be provided unless ordered by the trial court or specifically requested by Mother. Mother did not request any services from the trial court or the Division, but she began receiving counseling at her own expense in Arkansas.

Melanie Farris ("Ms. Farris") testified that she was Mother's counselor in Arkansas, and that a colleague, Ken Pruett ("Mr. Pruett"), had performed a psychiatric evaluation of Mother. This September 4, 2014 evaluation, admitted into evidence on Mother's behalf without objection, diagnosed Mother with Post Traumatic Stress Disorder ("PTSD") and Depressive Disorder. It was Ms. Farris's understanding that Mr. Pruett had recommended that Mother receive individual counseling in order to learn coping, calming, communication, and feelings-identification skills. Ms. Farris testified that "the question we need to have answered" is Mother's "protective capacity[.]"

6

The Division's petition to terminate parental rights was tried on September 11, 2015,[4] and the trial court entered the judgments that terminated Mother's parental rights to the Children on October 12, 2015.  This appeal timely followed.

**The Judgments**

The judgments included substantially similar findings for M.A.M., D.T.M., and W.V.M.  After finding under section 211.447.5(2) that Mother had neglected M.A.M., and had abused and neglected D.T.M. and W.V.M., the trial court addressed the factors set forth in subparagraphs (a) through (d).  Mother's conditions of "post-traumatic stress disorder and depression/anxiety . . . . were not found to render [M]other unable to knowingly provide" for the Children under subparagraphs (a) or (b).

In addressing subparagraph (c), the trial court found "overwhelming evidence that [M]other knew or should have known that severe and recurrent acts of physical and emotional abuse" were being committed against D.T.M. and W.V.M.  The court cited the 2012 incident, and Father's abuse of W.V.M. in 2014 that led to the court taking jurisdiction over the Children ("the 2014 incident").  The judgments referred to Father as Mother's "then-husband[.]"  The judgments also found that M.A.M. suffered emotional harm by witnessing this abuse of her younger siblings.  The judgments further found that Mother had witnessed these incidents of abuse, and although she had the opportunity to report them to the authorities, Mother did not report the 2014 incident until after she had initially lied about it to officials from both WIC and the Division.

In regard to subparagraph (d), the trial court found a repeated and continuous failure by Mother, although physically or financially able, to provide the Children with

---

[4] At trial, counsel for the Division presented its evidence in support of its petition, but counsel for the Juvenile Office also appeared, cross-examined some witnesses, offered an exhibit into evidence, and argued in support of the termination of Mother's parental rights.

7

adequate food, clothing, shelter, or other care and control necessary for their physical, mental, or emotional health and development. The judgments additionally found that M.A.M. had "an untreated walking problem that caused her to walk around on her tip-toes"; D.T.M. "was behind in his immunizations, had difficulty walking on his own, his verbal skills were lacking for a child of similar age, and he had thin hair and bald spots on his head"; and W.V.M. "was behind in her immunizations, was not able to walk on her own, her verbal skills were lacking for a child of similar age, she was losing weight and the hair on her head was thin." The trial court also found that Mother, as a stay-at-home mother, knew about and contributed to the multiple instances of unsanitary conditions in the home. These conditions included garbage cluttered throughout the home, piles of dirty dishes in the kitchen, and standing water in the basement.

The trial court also found that termination was proper on the section 211.447.5(3) failure to rectify ground. In doing so, the trial court found that conditions of a potentially harmful nature continued to exist, there was little likelihood that those conditions would be remedied at an early date so that the Children could be returned to Mother in the near future, and a continuation of Mother's parental relationship with the Children would greatly diminish the Children's prospects for early integration into a stable and permanent home. In regard to the acts or conditions of Mother relevant under subparagraphs (a) through (d) of that provision, the judgments found no evidence of any mental condition or chemical dependency under subparagraphs (c) or (d). In regard to subparagraph (a), the trial court (incorrectly, as the parties agree) found that "[M]other has failed to enter into a Written Service Agreement with the Children's Division. The Children's Division

offered a Written Service Agreement to [M]other, but she refused to enter into it." In

regard to subparagraph (b), the judgments found:

> The [Division] has been unsuccessful, as has the Juvenile Office, in aiding [Mother] on a continuing basis in adjusting her circumstances or conduct to provide a proper home for the [Children]. Mother was offered services by the [Division] to assist her after the [Children were] taken into protective custody, including paying for psychiatric counseling. However, Mother moved to Paragould, Arkansas, and chose to obtain her own therapy services after being informed that [the Division] would not be able to pay for services outside of Missouri. Mother's move to Arkansas frustrated efforts by the Division in helping her to adjust her circumstances.

Mother timely appealed the judgments, and we will address her points out of

order for ease of analysis.

**Analysis**

*Point II – Failure to Rectify (211.447.5(3))*

Mother's second point claims no substantial evidence supported the termination

of her parental rights on the ground of failure to rectify because no evidence of Mother's

current situation supported termination on this ground. We agree.

> Analysis under section 211.447.5(3) is two-fold. First, the trial court must determine whether the conditions that originally justified the court's jurisdiction exist, or new potentially dangerous conditions presently exist. Second, the trial court is required to consider and make findings under each of the four factors. Each factor is not a separate ground for termination but is a category the court must consider with all other relevant evidence. In other words, the factors provide an organizational framework through which the trial court examines much of the evidence in order to determine whether the parent has failed to remedy a condition, and whether that failure is likely to continue. Additionally, while the trial court is statutorily required to make specific findings on each factor ..., these findings are not a substitute for an articulated finding of the presence of a dangerous condition.

***In re T.J.P., Jr.***, 432 S.W.3d 192, 202 (Mo. App. W.D. 2014) (internal citations,

quotations, and brackets omitted).

9

The trial court must also engage in a prospective analysis to determine whether grounds exist for termination. *K.A.W.*, 133 S.W.3d at 9.[5] "An essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent." *Id.* "Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior." *Id.* at 9-10. Additionally, "[t]here must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *Id.* at 10. A parent's efforts or success in complying with a written service agreement may provide an indication of her future effort to care for her children. *Id.* "Termination may not be based upon failure to comply with the service plan in itself, but only to the extent the non-compliance demonstrates harm to the child." *In re A.M.W.*, 448 S.W.3d 307, 316 (Mo. App. E.D. 2014).

Here, the trial court concluded that conditions of a potentially harmful nature continued to exist, but it did not identify those conditions. The judgments stated that Mother had frustrated the Division's efforts to help her by moving to Arkansas and choosing to obtain counseling there instead of accepting counseling services provided by the Division, but to the extent that counseling was a part of Mother's goals in the services agreement, the trial court "did not discuss how Mother's failure to comply with this element of the service plan impacted any future ability to parent [the Children]." *See A.M.W.*, 448 S.W.3d at 318.

---

[5] "The decision in *K.A.W.* discussed consideration of future harm in the contexts of abuse and neglect; failure to rectify, and unfitness to parent." *In re X.D.G.*, 340 S.W.3d 607, 622 n.9 (Mo. App. S.D. 2011).

Mother's declination of psychiatric counseling in Missouri, and her move across the border into Arkansas, do not indicate that a potentially dangerous condition existed at the time of trial or establish a convincing link between Mother's past conduct and any future ability to parent the Children. Mother's service agreement did not require that Mother receive counseling only through the Division or only at the Division's expense. Mother did not provide the Division with a release of her counseling records when asked to do so sometime prior to September 2014, but her counselor testified at trial, a copy of Mother's psychological evaluation was admitted into evidence without objection, and the counselor was subject to cross-examination.

The Division argues that substantial evidence supported Mother's continued inability to protect her children and a continuing harmful condition. Specifically, the Division points to Ms. Farris's testimony that she could not assess Mother's "protective capacity" over the Children without observing Mother with the Children, which Ms. Farris had not done. This argument is unpersuasive because Ms. Farris's statement that she could not testify to Mother's protective capacity with the Children does not provide substantial evidence of a current or future harm to the Children from a continued relationship with Mother. In other words, Ms. Farris's lack of knowledge on this matter is not evidence that Mother's current or future parenting skills are deficient.

Further, the Division's evidence about Mother's supervised visits with the Children, viewed in the light most favorable to the judgments, do not constitute substantial evidence of a current or future lack of protective capacity. The Division's first caseworker, Melinda Taylor ("Ms. Taylor"), testified that between May to September 2014, Mother was initially unable to handle the Children without her own

11

mother present, and the Children did not interact well with each other, "but as time progressed, they did much better." Mamie Winstead ("Ms. Winstead"), the Division's service worker from September 2014 to December 2014, testified that Mother "did her very best to spend time with each of the [C]hildren." This testimony did not demonstrate a specific future risk to the Children from their association with Mother. Ms. Winstead also testified that the Children tended to keep to themselves during the visits, but Mother tried to get them to interact with her. When asked if Mother could handle all three children at one time, Ms. Winstead responded that Mother was "definitely busy" "trying to, again, divide her one self [sic] between the three children." Being "definitely busy" while trying to simultaneously parent three children does not, in itself, demonstrate a lack of protective capacity.

After December 2014, Mother's visits were supervised by a private agency. Although seemingly available, the Division did not offer any evidence relating to the private agency's interactions with Mother and the Children during this period closest in time to the termination trial.

The Division argues that Mother's own testimony provided substantial evidence of a continued harmful condition – her inability to provide the Children with an appropriate home. The Division argues that because Mother moved to Arkansas, the Division could not evaluate the condition of her home there, and, even if it could, Mother did not want the Children to live with her in that home. The portions of the record cited by the Division do not support these assertions.

Mother's testimony on the issue was as follows. She had lived with a friend in Arkansas since the end of May 2014. Mother helped pay the bills and provided what she

could. Mother was saving up to rent a better place for the Children. Outside of testimony that the home was a trailer, no evidence was presented of the size, condition, or other characteristics of the home. And no evidence was presented that the Division had even attempted to investigate Mother's current home, that the Division was somehow prohibited from doing so, or that Mother had interfered with any such effort.

In short, there was simply no evidence to support the trial court's finding that Mother's move to Arkansas thwarted any effort by the Division to investigate and present evidence related to the current condition of Mother's home and that Mother did not wish for the Children to live with her there. As the party with the burden of proof at trial, the Division improperly implies that it was up to Mother to present such evidence.

Facts that supported the trial court's initial assumption of jurisdiction over the Children are certainly relevant to the propriety of a subsequent termination, but such evidence must be updated to reflect the conditions existing at the time of the termination trial in order to support the difficult, but necessary, assessment of the potential of future harm. *K.A.W.*, 133 S.W.3d at 10.

Because the trial court's failure to rectify finding was based solely on evidence of past conditions insufficient to determine even the current danger Mother might pose to the Children, let alone the likelihood of her harming them in the future, Point 2 is granted.

*Point I – Abuse and Neglect*

Mother's first point claims the trial court's abuse and neglect findings "were not supported by substantial evidence in that the court's findings and the evidence refer only to past actions of Mother and there was no evidence of Mother's current situation to

demonstrate that there was a likelihood of future harm to the [C]hildren." Mother concedes that sufficient evidence of physical and emotional abuse existed at the time the Children were removed from the home, but she argues that the trial court did not explicitly consider whether those past acts provided an indication of future harm or were convincingly linked to predicted future behavior. Again, we must agree.

Section 211.447.5(2) refers to both abuse and neglect, but they constitute independent grounds for terminating parental rights.

> The former involves non-accidental physical injury, sexual abuse, or emotional abuse; the latter means failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being.

*In re P.J.*, 403 S.W.3d 672, 675 n.5 (Mo. App. S.D. 2012) (internal quotations omitted). Subparagraphs (a) through (d) under section 211.447.5(2) "are simply categories of evidence to be considered along with other relevant evidence, rather than separate grounds for termination in and of themselves." *In re K.M.C., III*, 223 S.W.3d 916, 923 (Mo. App. S.D. 2007). "Nevertheless, proof of one such factor is sufficient to support termination on the statutory abuse or neglect ground." *Id.*

*Abuse*

In support of its abuse finding, the trial court cited only Mother's past conduct and did not explicitly determine that a likelihood of future harm existed for the Children based upon that past conduct. The Division asserts that substantial evidence of the likelihood of future harm from abuse by Mother is two-fold: (1) Mother's failed attempt at reunification through counseling; and (2) Mother's failure to report the Children's physical abuse to the authorities.

14

Having determined that the evidence regarding Mother's counseling is insufficient to demonstrate a current or future danger of harm to the Children, we proceed to the Division's second argument that there is a presumption that Mother constitutes a continuing threat to the Children based upon her past abuse in the absence of contrary evidence, citing *In re T.M.E.*, 169 S.W.3d 581, 588 (Mo. App. W.D. 2005).

*T.M.E.* involved a father whose parental rights were terminated following severe and recurrent physical abuse and a mother whose rights were terminated for abuse and failure to provide for her child. 169 S.W.3d at 585. The Western District reasoned that "[w]hen a parent has committed severe and recurrent acts of abuse toward his child, logic and life experiences dictate the presumption that an unreformed parent will continue to be a threat to the welfare of the child for the foreseeable future." *Id.* at 588. This district has also applied the presumption expressed in *T.M.E.* under circumstances where recurrent, severe abuse had been perpetrated against a child and no evidence showed that the parent had taken any steps toward reform. *See, e.g.*, *In re J.L.G.*, 399 S.W.3d 48, 60-63 (Mo. App. S.D. 2013) (physical and emotional abuse was severe and recurrent and there were "no facts, conduct, or factors" presented that would suggest the father had repented and reformed); *In re K.R.G.*, 248 S.W.3d 651, 653 (Mo. App. S.D. 2008) (no evidence showed that additional services were likely to bring about a lasting parental adjustment or that the parent had received counseling or had otherwise showed indications that he had repented or reformed).

Acknowledging that the application of the presumption from *T.M.E.* may be appropriate in cases in which no contrary evidence is presented, that is not what occurred in this case. Here, evidence was presented that Mother had moved away from Father and

15

had ended her marriage to him; Mother had not shown any inclination to either reunify with Father or enter into another abusive relationship; and Mother had "chose[n] to obtain her own therapy services[.]" In the presence of such evidence, we decline the Division's invitation to presume Mother's future dangerousness.

No substantial evidence supported a convincing link between Mother's past abuse, her conduct at the time of the termination hearing, and a likelihood that she would continue to abuse the Children in the future. *See K.A.W.*, 133 S.W.3d at 9-10; *see also In Interest of E.D.C.*, No. ED104085, 2016 WL 5724852, at *4 (Mo. App. E.D. Oct. 4, 2016) (reversing and declining to apply a presumption of future abuse where a mother had committed severe and recurrent acts of physical abuse against her children but had taken multiple steps to reform her behavior); *P.J.*, 403 S.W.3d at 675 (reversing where the trial court cited almost exclusively to evidence that occurred before the child came into care); *In re C.K.*, 221 S.W.3d 467, 474 (Mo. App. W.D. 2007) (reversing where the trial court relied only on past conduct in terminating parental rights).

*Neglect*

Regarding the likelihood of future harm due to neglect, the Division again argues that such evidence is two-fold: (1) Mother's failed attempt at reunification through counseling; and (2) Mother's failed attempt to obtain appropriate housing. Our previous discussion of the evidence (or lack thereof) related to Mother's counseling and housing applies with equal force to the trial court's neglect findings, and we will not repeat that analysis here.

On this record, we find no substantial evidence supporting a convincing link between Mother's past neglect and a likelihood that she will continue to neglect the

16

Children in the future, and, once again, the judgments give no indication that the trial court explicitly considered whether Mother's past neglect indicated such a likelihood of future harm. *See K.A.W.*, 133 S.W.3d at 9-10.

Mother's first point is also granted, and the judgments, insofar as they terminated Mother's parental rights, are reversed.[6]

DON E. BURRELL, J. – OPINION AUTHOR

JEFFREY W. BATES, P.J. – CONCURS

MARY W. SHEFFIELD, C.J. – CONCURS

---

[6] This reversal does not require an immediate return of physical custody to Mother or prohibit future proceedings to terminate her parental rights. *See X.D.G.*, 340 S.W.3d at 622. The Children remain in the Division's custody and under the trial court's jurisdiction. *See id.* We have not addressed the trial court's best interest finding for two reasons. First, Mother has not challenged that finding on appeal. *See In re Q.A.H.*, 426 S.W.3d 7, 12 (Mo. banc 2014). Second, our ruling in Mother's favor on the grounds for termination renders any best-interest findings moot. *X.D.G.*, 340 S.W.3d at 622. Mother's third point, challenging other failure-to-rectify-related claims of error, along with additional allegations of error Mother made in her second point are also rendered moot by our disposition and will likewise not be addressed.